shall not accrue on or after the Petition Date on account of any Claim. Without limiting the generality of the foregoing, interest shall not be paid upon any Disputed Claim in respect of the period from the Filing Date to the date a final distribution is made thereon if, and after, such Disputed Claim becomes an Allowed Claim.

**N.      Section 506(c) Reservation**

The Debtors and the Reorganized Debtors, as applicable, reserve all rights under Bankruptcy Code section 506(c) with respect to any and all Secured Claims.

**O.      Single Satisfaction of Claims**

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full amount of the Allowed Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim.

**P.      Allocation of Consideration**

The aggregate consideration to be distributed to the Holders of Allowed Claims in each Class under this Plan will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such Holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any, to the extent that interest is payable under this Plan.

**Q.      Special Provision Regarding Unimpaired Claims**

Except as otherwise provided in this Plan, the Confirmation Order, any other order of the Bankruptcy Court, or any document or agreement entered into and enforceable pursuant to the terms of this Plan, nothing herein shall affect the Debtors' or Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims or to request disallowance or subordination of any such Claim. In addition, notwithstanding anything to the contrary, Unimpaired Claims are subject to all applicable provisions of the Bankruptcy Code, including Bankruptcy Code section 502(b).

**VIII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

**A.      Prosecution of Objections to Claims**

The Debtors (with the consent of the Majority Noteholders) or the Reorganized Debtors, as applicable, shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan provided that, for the avoidance of doubt, the Debtors and Reorganized Debtors will not object to Claims that are specified in this Plan as Allowed Claims. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Debtors (with the consent of the Majority Noteholders) reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

**B.      Allowance of Claims**

Except as expressly provided herein or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), the Reorganized Debtors after the Effective Date will have and retain any and all rights and defenses held by the Debtors with respect to any Claim as of the Petition Date.

## C.    Distributions After Allowance

On the first Distribution Date following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled in accordance with Article III of the Plan. For the avoidance of doubt, Holders of Allowed Claims will receive the same treatment regardless of whether such Claims are Allowed as of the Effective Date or at some time after the Effective Date.

## D.    Estimation of Claims

The Debtors (before the Effective Date and with the consent of the Majority Noteholders) or Reorganized Debtors (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to Bankruptcy Code section 502(c) regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time including, without limitation, during litigation concerning any objection to any Claim and during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors (before the Effective Date) or the Reorganized Debtors (after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

## E.    Deadline to File Objections to Claims

Unless otherwise ordered by the Bankruptcy Court, any objections to Claims shall be filed on or before the date that is the later of: (a) 180 days after the Effective Date, and (b) the last day of such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to certain Claims. The Bankruptcy Court may extend any deadline to object to Claims for cause.

## F.    Prosecution of Objections

After the Confirmation Date, the Reorganized Debtors shall have the authority to file objections, settle, compromise, withdraw, or litigate to judgment objections to Claims. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

## IX.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

## A.    Discharge of All Claims and Interests and Releases.

### (i)    General Discharge of All Claims and Interests and Releases

**Except as otherwise expressly provided in this Plan, the confirmation of this Plan (subject to the occurrence of the Effective Date) will discharge the Debtors and the Reorganized Debtors from any Claim that arose before the Confirmation Date and any Claim of the kind specified in Bankruptcy Code sections 502(g), 502(h) or 502(i), whether or not a Proof of Claim is filed or is deemed filed, whether or not such Claim is Allowed and whether or not the Holder of such Claim has voted on this Plan. Confirmation of this Plan will not discharge any DIP Lender Claims or other DIP Borrowing Obligations, DIP Interest Obligations, DIP Financing Fees and Expenses or DIP Agent Fees under the DIP Loan Agreement unless and until all such DIP Lender Claims and other DIP obligations are paid in full, in cash or receive the DIP Equity Distribution, as applicable.**

Furthermore, but in no way limiting the generality of the foregoing, except as otherwise specifically provided by this Plan, the distributions and rights (which distribution and rights may include the continuation of pre-petition liens, security interests, or other rights) that are provided in this Plan will be in complete satisfaction, discharge and release, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date), of all Claims and Causes of Action against, liabilities of, liens on, obligations of and Equity Interests in GOK or Reorganized GOK or the direct or indirect assets and properties of the Debtors or the Reorganized Debtors, whether known or unknown, regardless of whether a Proof of Claim or interest was filed, whether or not Allowed and whether or not the Holder of the Claim or GOK Equity Interest has voted on this Plan, or based on any act or omission, transaction or other activity or security, instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date that was or could have been the subject of any Claim or GOK Equity Interest, in each case regardless of whether a Proof of Claim or interest was filed, whether or not Allowed and whether or not the Holder of the Claim or GOK Equity Interest has voted on this Plan; provided, however, that notwithstanding the foregoing, nothing in this Plan or the Disclosure Statement is intended to release any insurer from having to provide coverage under any policy to which the Debtors, the Reorganized Debtors, and/or their current or former officers, directors, employees, representatives, or agents are parties or beneficiaries.

Additionally, except as otherwise specifically provided by this Plan or the Confirmation Order, the confirmation of this Plan (subject to the occurrence of the Effective Date) shall act as a discharge and release of all Causes of Action (including Causes of Action of a trustee and debtor in possession under the Bankruptcy Code) of the Debtors and Reorganized Debtors, whether known or unknown, against (in each case, only in the specified capacity): (a) their present and former directors, shareholders, officers and employees, agents, attorneys, advisors, accountants, financial advisors, and investment bankers; (b) the present and former Credit Facility Agent and the present and former Credit Facility Lenders, each in such capacity, and their respective present and former Affiliates, officers, directors, shareholders, advisory Affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (c) the present and former Noteholders and their respective present and former Affiliates, officers, directors, shareholders, advisory Affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (d) the Notes Indenture Trustee and its present and former Affiliates, officers, directors, shareholders, advisory Affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (e) the Collateral Trustee and its present and former Affiliates, officers, directors, shareholders, advisory Affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (f) each of the Backstop DIP Lenders and each of the respective Backstop DIP Lenders' present and former Affiliates, officers, directors, shareholders, advisory Affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); (g) the DIP Agent, and the DIP Lenders and each of their respective present and former Affiliates, officers, directors, shareholders, advisory Affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons and entities); (h) the present and former Holders of the Senior Preferred Equity Interests and their respective present and former Affiliates, officers, directors, shareholders, advisory Affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities); and (i) any Entity claimed to be liable derivatively through any of the foregoing. Notwithstanding the generality of the foregoing, unless expressly agreed to by the Debtors (with the consent of the Majority Noteholders) or the Reorganized Debtors, nothing in this Plan shall release any claims of any of the Debtors or Reorganized Debtors, as the case may be, against any Subsidiaries that are not Debtors or Reorganized Debtors, as the case may be; provided, however, that the foregoing releases shall not apply to any person or Entity who, in connection with any act or omission by such person or Entity in connection with or relating to the Debtors or their businesses, has been or is hereafter found by any court or tribunal by Final Order to have acted with gross negligence or willful misconduct.

*(ii)*     *Releases by Holders of Claims and Equity Interests*

In addition, but in no way limiting the generality of the foregoing, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, for good and valuable consideration, including the contributions of the following parties to the facilitation and expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, each Holder of a Note Claim or Senior Preferred Equity Interest who does not opt out of the release provisions in the Plan on their ballot agrees to the release provisions of this Plan and is presumed conclusively to have unconditionally and forever released (a) the Debtors, (b) the Reorganized Debtors, (c) the present and former Credit Facility Lenders, (d) the Credit Facility Agent, (e) the DIP Lenders, (f) the DIP Agent, (g) the Backstop DIP Lenders, (h) the Collateral Trustee, (i) the Notes Indenture Trustee, (j) the Consenting Noteholders, (k) the Consenting Preferred Equity Holders, and (l) the Debtors' officers, directors, and employees who hold such positions on the Petition Date and any Entity claimed to be liable derivatively through any of the foregoing and with respect to each of the foregoing Entities in clauses (a) through (k), the present and former members of any such Entities (together with the advisory Affiliates and advised Affiliates of such members) (and each solely in their capacity as such), their respective successors, assigns, and each of their respective Affiliates officers, directors, shareholders, advisory Affiliates, members, employees, agents, attorneys, advisors, accountants, financial advisors, investment bankers, successors and assigns (including any professionals retained by such persons or entities) from any Cause of Action based on the same subject matter as the Claim or Interest on which the distribution is received; provided, however, that the foregoing releases shall not apply to any person or Entity who, in connection with any act or omission by such person or Entity in connection with or relating to the Debtors or their businesses, has been or is hereafter found by any Final Order or any court or tribunal to have acted with gross negligence or willful misconduct; provided, however that nothing herein shall be deemed a waiver or release of a Holder of a Claim or Equity Interest to receive the distribution as provided for under the Plan; provided, however, that the Consenting Noteholders and the Consenting Preferred Equity Holder have previously agreed to provide the releases set forth in this Section and shall not have the ability to opt out of such release provisions. For the avoidance of doubt, if a Holder of a Note Claim or a Senior Preferred Equity Interest submits a ballot without checking either the "Opt Out of the Releases" box or the "Not Opt Out of the Releases" box, then it will be deemed to consent to the releases contemplated by Article IX of the Plan.

**B.     Exculpation**

Except as otherwise specifically provided in the Plan, each of: (a) the Debtors and the Reorganized Debtors, (b) the Creditors' Committee, if any, and the current and former members thereof, in their capacity as such, (c) the DIP Lenders, solely in such lenders' capacity as such, (d) the DIP Agent, solely in such agent's capacity as such, (e) the Credit Facility Agent, solely in its capacity as such, (f) the Notes Indenture Trustee, solely in its capacity as such, (g) the Collateral Trustee, solely in its capacity as such, (h) the Consenting Noteholders, and (i) the Consenting Preferred Equity Holders; with respect to each of the foregoing Entities in clauses (a) through (i), such Entities' Affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners and representatives, in each case solely in their capacity as such, will have no liability for any act or omission in connection with, or arising out of, the formulation, negotiation, or pursuit of approval of the DIP Facility, the Disclosure Statement, the Plan, or the solicitation of votes for or confirmation of the Plan, or the consummation of the Plan, or the transactions contemplated and effectuated by the Plan or the administration of the Plan or the property to be distributed under the Plan, or any other act or omission during the administration of the Debtors' Estates or in contemplation of the Chapter 11 Cases except for gross negligence or willful misconduct as determined by a Final Order of the Bankruptcy Court, and in all respects, will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

**C.     Injunction**

Sections IX.A and IX.B of this Plan and this Section IX.C will also act as an injunction against any Entity commencing or continuing any action, employment of process, or act to collect, offset or recover any

Claim, Interest or Cause of Action satisfied, released or discharged under this Plan. Notwithstanding any other provision of this Plan or the Confirmation Order, Confirmation of this Plan shall not enjoin or extinguish any Creditor's rights of setoff or recoupment, if any, to the extent that such Creditor has a valid Claim and a valid right of recoupment or setoff under applicable state or federal law (including, without limitation, the Bankruptcy Code). Without limiting the applicability of the foregoing, (a) mutuality shall be required for any setoff and (b) no creditor may setoff (i) any pre-petition Claim against any post-petition obligation owed to any of the Debtors or (ii) any post-petition claim against any pre-petition obligation owed to any of the Debtors. Nothing herein shall constitute any admission by any of the Debtors that any Creditor has a valid right of setoff or right of recoupment under applicable state or federal law (including the Bankruptcy Code); and, provided, further, that any and all defenses of the Debtors and/or Reorganized Debtors with respect to any such asserted right of setoff or right of recoupment and to challenge the assertion of any such right of setoff or recoupment are hereby preserved in their entirety.

D.      **Guarantees and Claims of Subordination**

        (i)      *Guarantees*

        The classification and the manner of satisfying all Claims under this Plan take into consideration (i) the possible existence of any alleged guarantees by the Debtors of obligations of any Entity or Entities, and (ii) that the Debtors may be joint obligors with another Entity or Entities with respect to the same obligation. The Holders of Claims will be entitled to only one distribution with respect to any given obligation of the Debtors under the Plan.

        (ii)     Claims of Subordination.

        Except as specifically provided herein, to the fullest extent permitted by applicable law, all Claims and GOK Equity Interests, and all rights and claims between or among Holders of Claims or GOK Equity Interests relating in any manner whatsoever to Claims or GOK Equity Interests, based on any contractual, equitable or legal subordination rights, will be terminated on the Effective Date and discharged in the manner provided in this Plan, and all such Claims, GOK Equity Interests and rights so based and all such contractual, equitable and legal subordination rights to which any Entity may be entitled will be irrevocably waived upon the Effective Date. To the fullest extent permitted by applicable law, the rights afforded and the distributions that are made in respect of any Claims or Equity Interests under this Plan will not be subject to levy, garnishment, attachment or like legal process by any Holder of a Claim or Equity Interest by reason of any contractual, equitable or legal subordination rights, so that, notwithstanding any such contractual, equitable or legal subordination rights, each Holder of a Claim or Equity Interest will have and receive the benefit of the rights and distributions set forth in this Plan; provided, however, that nothing in this Section IX.D(ii) shall affect the Claims or contractual, equitable or legal subordination rights of the Holders of Claims that are Unimpaired under this Plan and this Section IX.D(ii) shall not be deemed to Impair any Claims that are not otherwise Impaired pursuant to this Plan.

E.      **Injunction Related to Releases and Exculpation**

        **The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released pursuant to this Plan, including but not limited to the Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities discharged or released in Sections IX.A and B of this Plan.**

F.      **Release of Liens**

        Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is an Allowed Secured Claim as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall

revert to the Reorganized Debtor and its successors and assigns. For the avoidance of doubt, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court, or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

## X.
## CONDITIONS PRECEDENT TO CONFIRMATION
## OF THE PLAN AND THE EFFECTIVE DATE

**A.     Conditions Precedent to Confirmation**

It shall be a condition to Confirmation hereof that the following provisions, terms, and conditions shall have been satisfied or waived pursuant to the provisions of Section X.C.

*(i)*     The Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall have become a Final Order.

*(ii)*    All of the documents contemplated by this Plan and the Disclosure Statement, including the New Corporate Governance Documents, the Exit Facility Documents, the Rejected Executory Contract and Unexpired Lease List, the New Employment Agreements, and the list of the known members of the New Board, shall be in form and substance satisfactory to the Majority Noteholders.

**B.     Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following provisions, terms, and conditions shall have been satisfied or waived in accordance with Section X.C of this Plan by the applicable Debtor, with the consent of the Majority Noteholders, or as applicable, the Majority Noteholders; provided, however, that the consent of Avista shall be required to waive the condition in (x) below.

*(i)*      The Confirmation Order shall be a Final Order.

*(ii)*     The Confirmation Order shall have been entered no later than 35 days after the Petition Date.

*(iii)*    Any amendments or modifications to the Plan made after entry of the Confirmation Order shall be in form and substance satisfactory to the Majority Noteholders.

*(iv)*     Each of the documents contemplated by this Plan and the Disclosure Statement, including, without limitation, the New By-Laws, the New Certificate of Incorporation, and the New Shareholders Agreement, have been executed and, to the extent modified or supplemented from the form previously approved pursuant to Section X.A(ii) of this Plan, are in form and substance satisfactory to the Majority Noteholders.

*(v)*      All of the schedules, documents, supplements, and exhibits to the Plan shall have been filed in form and substance satisfactory to the Majority Noteholders.

*(vi)*     All authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents, if any, that are determined by the Debtors and the Majority Noteholders to be necessary to implement the Plan and that are required by law, regulation or order shall have been obtained and not revoked.

*(vii)*    All of the conditions referred to as the 'Certain Closing and Other Conditions to the Restructuring' that are set forth in the Restructuring Term Sheet (attached to and part of the Plan Support Agreement) have occurred or been waived by the Majority Noteholders.

38

(viii)    The Exit Facility Agreement, in form and substance satisfactory to the Majority Noteholders, shall have been executed and delivered by all of the Entities that are parties thereto and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof.

(ix)    All of the Majority Noteholders' professional fees and out-of-pocket expenses incurred in connection with the Restructuring or any other matter in connection thereto, including, without limitation, those fees and expenses incurred during the Chapter 11 Cases, shall be paid by the Debtors.

(x)    Up to $75,000 in the aggregate of Avista's professional fees and out-of-pocket expenses incurred in connection with the Restructuring or any other matter in connection thereto, including without limitation, those fees and expenses incurred during the Chapter 11 Cases, shall be paid by the Debtors.

(xi)    The amount of all Claims against the Debtors, including, without limitation, all trade and other Unsecured Claims, but excluding Claims for amounts owed under the Credit Facility and the Notes, and excluding Claims for amounts typically accounted for as deferred revenue on the Debtors' balance sheet, reasonably projected by the Majority Noteholders to become Allowed Claims (including such Claims that at such date are already reasonably determined by the Majority Noteholders to be Allowed Claims) do not exceed in the aggregate $85.7 million.

(xii)    No Claims of the type described in Bankruptcy Code section 510(b) relating to the Notes shall have been asserted against the Debtors and not Disallowed by Final Order.

## C.    Waiver of Conditions

The conditions to Confirmation of the Plan and the conditions to the occurrence of the Effective Date set forth in Sections X.A and X.B may, in each case, be waived without any notice to parties in interest or the Bankruptcy Court and without a hearing at any time by the Debtors with the consent of the Majority Noteholders; provided, however, that the Debtors may not waive entry of the Confirmation Order.

## D.    Effect of Failure of Conditions

If all the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived on or before the first Business Day that is more than 50 days after the Petition Date, or by such later date as is acceptable to the Majority Noteholders, and approved, after notice and a hearing, by the Bankruptcy Court, then upon motion by the Debtors (with the consent of the Majority Noteholders) made before the time that all of the conditions have been satisfied or duly waived, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order will not be vacated if each of the conditions precedent to the occurrence of the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Effective Date does not occur or the Confirmation Order is vacated pursuant to this Section, this Plan will be null and void in all respects, and nothing contained in this Plan will (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors, (b) prejudice in any manner the rights of the Debtors or the Holder of any Claim or Equity Interest in the Debtors or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Equity Interests or any other Entity in any respect.

XI.<br>MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

## A.    Modification and Amendments

Except as otherwise specifically provided herein, the Debtors reserve the right to modify the Plan, with the consent of (i) the Majority Noteholders and (ii) Avista (but, with respect to Avista, only insofar as any such

modification adversely affects the treatment of the Senior Preferred Equity Interests under this Plan), as to material or immaterial terms prior to Confirmation and seek Confirmation consistent with the Bankruptcy Code and, as appropriate and consistent with the Bankruptcy Code, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in Bankruptcy Code section 1127 and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to (with the consent of the Majority Noteholders) alter, amend, or modify materially or immaterially the Plan with respect to any or all Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article XI. For the avoidance of doubt, non-material modifications may be made by the Debtors with the consent of the Majority Noteholders.

In addition, prior to the Effective Date, the Debtors (with the consent of the Majority Noteholders) may make appropriate technical adjustments and modifications to the Plan, without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications do not adversely affect in a material way the treatment of any Holder of Claims or Equity Interests.

A Holder of an Allowed Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim or Equity Interest of such Holder.

## B.    Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to Bankruptcy Code section 1127(a) and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

## C.    Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the entry of the Confirmation Order with the consent of the Majority Noteholders. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of executory contracts or unexpired leases effected by the Plan and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Equity Interests or Claims by any Debtor against any other Entity, (b) prejudice in any manner the rights of such Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## XII.
## RETENTION OF JURISDICTION

The business and assets of the Debtors shall remain subject to the jurisdiction of the Bankruptcy Court until the Effective Date. From and after the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction of all matters arising out of, and related to the Chapter 11 Cases or this Plan pursuant to, and for purposes of, Bankruptcy Code subsection 105(a) and section 1142 and for, among other things, to:

(i)    determine any and all disputes relating to Administrative Expenses, Claims and Equity Interests, including the allowance and amount thereof, and any right to setoff,

(ii)    determine any and all disputes among creditors with respect to their Claims,

(iii)     decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan,

(iv)     resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including Rejection Claims, Cure Claims pursuant to Bankruptcy Code section 365 or any other matter related to such executory contract or unexpired lease, (b) any potential contractual obligation under any executory contract or unexpired lease that is assumed, (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, the Assumed Executory Contract and Unexpired Lease List and/or the Rejected Executory Contract and Unexpired Lease List, and (d) any dispute regarding whether a contract or lease is or was executory or expired,

(v)     ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan,

(vi)     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date,

(vii)     adjudicate, decide, or resolve any and all matters related to Bankruptcy Code section 1141,

(viii)     enter and enforce any order for the sale of property pursuant to Bankruptcy Code sections 363, 1123, or 1146(a),

(ix)     resolve any avoidance or recovery actions under Bankruptcy Code sections 105, 502(d), 542 through 551, and 553,

(x)     resolve any cases, claims, controversies, suits, disputes, or causes of action that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan,

(xi)     resolve any cases, controversies, suits, disputes, or causes of action that may arise in connection with or under the DIP Loan Agreement,

(xii)     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan,

(xiii)     resolve any cases, controversies, suits, disputes, or causes of action with respect to the discharge, releases, injunctions, exculpations, indemnifications, and other provisions contained in Article IX and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions,

(xiv)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated,

(xv)     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement,

(xvi)     adjudicate any and all disputes arising from or relating to distributions under the Plan,

41

(xvii)    consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order,

(xviii)    determine requests for the payment of Claims and Equity Interests entitled to priority pursuant to Bankruptcy Code section 507, including requests by Professionals for payment of accrued professional compensation.

(xix)    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan,

(xx)    hear and determine any issue related to the initial composition of the New Board of each of the Reorganized Debtors,

(xxi)    hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146,

(xxii)    hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date,

(xxiii)    enforce all orders previously entered by the Bankruptcy Court,

(xxiv)    hear any other matter not inconsistent with the Bankruptcy Code or related statutory provisions setting forth the jurisdiction of the Bankruptcy Court, and

(xxv)    enter a final decree closing the Chapter 11 Cases.

## XIII.
## MISCELLANEOUS PROVISIONS

**A.    Immediate Binding Effect**

Subject to the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests have accepted or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, or injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.

**B.    Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents acceptable to the Majority Noteholders as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims and Equity Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.    Dissolution of Statutory Committees, If Any**

On the Effective Date, any duly appointed statutory committee shall dissolve and members thereof shall be released and discharged from all rights, duties, responsibilities, and obligations from or related to the Chapter 11

Cases. In addition, the retention and employment of the Creditors' Committee's and any other statutory committee's attorneys, accountants, and other professionals and agents shall terminate on the Effective Date.

**D.    Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**E.    Service of Documents**

All notices required to be given under this Plan, if any, will be in writing and will be sent by first class mail, postage prepaid, or by a nationally recognized overnight courier:

If to the Debtors or Reorganized Debtors:

> Geokinetics Inc.
> 1500 Citywest Boulevard, Suite 800
> Houston, Texas 77042
> Attn:    David Crowley, CEO
>          William (Bill) Moll, Jr., General Counsel
> Telephone: (713) 850-7600
> Facsimile: (713) 850-7330

> with copies to:

> Akin Gump Strauss Hauer & Feld LLP
> 1700 Pacific Avenue, Suite 4100
> Dallas, Texas 75201
> Attn:    Sarah Link Schultz
>          Michael S. Haynes
> Telephone: (214) 969-2800
> Facsimile: (214) 969-4343

> -and-

> Akin Gump Strauss Hauer & Feld LLP
> 1111 Louisiana Street, 44th Floor
> Houston, Texas 77002
> Attn:    David Patrick Elder
> Telephone: (713) 220-5800
> Facsimile: (713) 236-0822

If to the Noteholders:

> Larry First
> American Securities Opportunities
> Advisors, LLC
> 299 Park Avenue
> 34th Floor
> New York, NY 10171

> -and-

Jeffrey Gates
Gates Capital Management, Inc.
1177 Avenue of the Americas
32nd Floor
New York, NY 10036

with a copy to:

Jennifer Rodburg, Esq.
Richard Slivinski, Esq.
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004-1980
Telephone: (212) 859-8000
Facsimile: (212) 859-4000

Any of the above may, from time to time, change its address for future notices and other communications hereunder by filing a notice of the change of address with the Court. Any and all notices given under this Plan will be effective when received.

**F.      Captions**

Article and Section captions used in this Plan are for convenience only and will not affect the construction of this Plan.

**G.      Nonvoting Stock**

In accordance with Bankruptcy Code section 1123(a)(6), the Reorganized Debtors' Certificates of Incorporation will contain a provision prohibiting the issuance of nonvoting equity securities by each of the Reorganized Debtors, subject to further amendment of such Reorganized Debtor's Certificate of Incorporation as permitted by applicable law.

**H.      Entire Agreement**

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, whether written or oral, all of which have become merged and integrated into the Plan.

**I.      Severability of Plan Provisions**

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising jurisdiction to be invalid, void, or unenforceable, the Bankruptcy Court or other court exercising jurisdiction, at the request of the Debtors with the consent of the Majority Noteholders, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, and (3) nonseverable and mutually dependent.

J.      **Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon request to the Debtors' counsel, by contacting Sarah J. Crow, Akin Gump Strauss Hauer & Feld LLP, 1700 Pacific Avenue, Suite 4100, Dallas, Texas 75201, (214) 969-4278, email: sjcrow@akingump.com, at the Bankruptcy Court's website at www.ecf.deb.uscourts.gov or at the website of the Debtors' notice, claims and solicitation agent, Garden City Group, Inc., at http://www.gokrestructuring.com. To the extent any exhibit or document included in the Plan Supplement is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, such exhibit or document shall control.

K.      **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, (i) the Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to Bankruptcy Code section 1125(e), (ii) the Debtors, each member of a statutory committee, if any, the Backstop DIP Lenders and each of the Consenting Noteholders and Consenting Preferred Equity Holders (and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, attorneys and other professionals) will be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the New Common Stock under this Plan, and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

L.      **Closing of Chapter 11 Cases**

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

M.      **Conflicts**

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; provided, however, that if there is a conflict between this Plan and a Plan Supplement document, the Plan Supplement document shall govern and control; and provided further, however, that to the extent that any provision of the Plan or a Plan Supplement document conflicts with or is in any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control.

Wilmington, Delaware
Date: February 7, 2013

**Geokinetics Inc.**

By: _____
Name: David J. Crowley
Its: President & CEO

**Geokinetics Holdings USA, Inc.**

By: _____
Name: David J. Crowley
Its: President & CEO

**Geokinetics Services Corp.**

By: _____
Name: David J. Crowley
Its: President & CEO

**Geokinetics Processing, Inc.**

By: _____
Name: David J. Crowley
Its: President & CEO

**Geokinetics Acquisition Company**

By: _____
Name: David J. Crowley
Its: President & CEO

**Geokinetics USA, Inc.**

By: _____
Name: David J. Crowley
Its: President & CEO

**Geokinetics International Holdings, Inc.**

By: _____
Name: David J. Crowley
Its: President & CEO

**Geokinetics Management, Inc.**

By: _____
Name: David J. Crowley
Its: President & CEO

**Geokinetics International, Inc.**

By: _____
Name: David J. Crowley
Its: President & CEO

**Advanced Seismic Technology, Inc.**

By: _____
Name: David J. Crowley
Its: President & CEO

**RICHARDS, LAYTON & FINGER, P.A.**
Paul N. Heath (DE 3704)
L. Katherine Good (DE 5101)
Tyler D. Semmelman (DE 5386)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

– and –

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Sarah Link Schultz (*pro hac vice* motion pending)
Michael S. Haynes (*pro hac vice* motion pending)
Sarah J. Crow (*pro hac vice* motion pending)
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343

**PROPOSED COUNSEL FOR DEBTORS AND
DEBTORS IN POSSESSION**

**EXHIBIT B**

**ORGANIZATIONAL CHART OF THE DEBTORS AND THEIR NON-DEBTOR AFFILIATES**



**EXHIBIT C**

**LIQUIDATION ANALYSIS**

**EXHIBIT C**

**LIQUIDATION ANALYSIS**

The Bankruptcy Code requires that each Holder of an Impaired Claim or Equity Interest either (a) accept the Plan or (b) receive or retain property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under Chapter 7. This is commonly referred to as the "best interest" test.

The first step in determining if the best interest test has been met is to determine the estimated Cash available for distribution. Mechanically, this includes, (a) estimating the proceeds that would be generated from the liquidation of the Debtors' assets during a hypothetical Chapter 7 case, (b) adding the anticipated Cash on hand as of the filing date, and (c) deducting the costs and expenses of the liquidation and additional Chapter 7 administrative expenses. At the conclusion of this calculation, net Cash (if any) is allocated to Holders of Claims and Equity Interests in accordance with Bankruptcy Code section 726. For purposes of this liquidation analysis, it is assumed that the Debtors' assets are liquidated for the benefit of the Debtors' creditors. A general summary of the assumptions used by the Debtors in preparing this liquidation analysis follows. The more specific assumptions are discussed below the liquidation analysis.

*Estimate of Net Proceeds*

For purposes of this liquidation analysis, the Chapter 7 liquidation period is assumed to commence on March 1, 2013 and to last 9 – 12 months. Recoveries to creditors are presented on an undiscounted basis. For purposes of the analysis, estimated asset balances as of December 31, 2012 were used to estimate recoveries. Under Bankruptcy Code section 704, an appointed trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the best interests of the parties in interest. The liquidation analysis assumes that there would be pressure to complete the sales process within three months. There can be no assurance that the liquidation would be completed in a limited time frame, nor are there any assurances that the recoveries assigned to the assets would in fact be realized.

*Estimate of Costs*

The Debtors' cost of liquidation under Chapter 7 includes fees payable to a Chapter 7 trustee, as well as those payable to attorneys and other professionals engaged by the Chapter 7 trustee. Further, costs of liquidation also include any obligations and unpaid expenses incurred by the Chapter 7 trustee until conclusion of the Chapter 7 case. Finally, additional claims would arise as a result of the rejection of the Debtors' executory contracts and/or unexpired leases. It is possible that in a Chapter 7 case, the wind-down expenses may be greater or less than the estimated amount. Such expenses are in part dependent on how long it takes the Chapter 7 trustee to complete the liquidation.

*Distribution of Net Proceeds under Chapter 7*

Bankruptcy Code section 726 governs distributions of property of an estate. The costs, expenses, fees, and such other claims that may arise and constitute necessary costs and expenses in a liquidation case would be paid in full from the liquidation proceeds before such proceeds would be made available for distribution to unsecured creditors. As set forth below, the Debtors believe that in a Chapter 7 case, general unsecured creditors would receive a recovery estimated at 0.0%.

After considering of the effects a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, including (i) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a Chapter 7 trustee and its professionals, (ii) an erosion in the value of assets in the Chapter 7 cases in the context of the expeditious liquidation required under Chapter 7 and the forced sales atmosphere that would likely prevail, and (iii) the substantial increase in Claims that would need to be satisfied on a priority basis, the Debtors have determined, as summarized on the following chart, that confirmation of the Plan will provide each Holder of a Claim with a recovery equal to or greater than such Holder would receive pursuant to a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

THE DEBTORS' LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MIGHT BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE DEBTORS'

ASSETS. UNDERLYING THE LIQUIDATION ANALYSIS ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES, AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE. IN ADDITION, VARIOUS LIQUIDATION DECISIONS UPON WHICH CERTAIN ASSUMPTIONS ARE BASED ARE SUBJECT TO CHANGE. THEREFORE, THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS AND ESTIMATES EMPLOYED IN DETERMINING THE LIQUIDATION VALUES OF THE ASSETS WILL RESULT IN AN ACCURATE ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED WERE THE DEBTORS TO UNDERGO AN ACTUAL LIQUIDATION. THE ACTUAL AMOUNTS OF CLAIMS AGAINST THE ESTATES COULD VARY SIGNIFICANTLY FROM THE ESTIMATE SET FORTH HEREIN, DEPENDING ON THE CLAIMS ASSERTED DURING THE PENDENCY OF THE CHAPTER 7 CASES. MOREOVER, THIS LIQUIDATION ANALYSIS DOES NOT INCLUDE LIABILITIES THAT MAY ARISE AS A RESULT OF LITIGATION, CERTAIN NEW TAX ASSESSMENTS, OR OTHER POTENTIAL CLAIMS. THIS ANALYSIS ALSO DOES NOT INCLUDE POTENTIAL RECOVERIES FROM AVOIDANCE ACTIONS. MINIMAL VALUE WAS ASSIGNED TO ADDITIONAL PROCEEDS THAT MIGHT RESULT FROM THE SALE OF CERTAIN ITEMS WITH INTANGIBLE VALUE. THEREFORE, THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS COULD VARY MATERIALLY FROM THE ESTIMATES PROVIDED HEREIN.

THE LIQUIDATION ANALYSIS INCLUDED IN THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY, AND IS THE RESPONSIBILITY OF, THE DEBTORS' MANAGEMENT. THE DEBTORS AND THEIR MANAGEMENT BELIEVE THAT THE LIQUIDATION ANALYSIS HAS BEEN PREPARED ON A REASONABLE BASIS, REFLECTING MANAGEMENT'S BEST ESTIMATES AND JUDGMENTS. HOWEVER, BECAUSE THIS INFORMATION IS HIGHLY SUBJECTIVE, IT SHOULD NOT BE RELIED ON AS NECESSARILY INDICATIVE OF FUTURE RESULTS.

## Liquidation Analysis ($ in millions)

| | Book Value | Recovery (%) | | Recovery Value ($) | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| *Current assets* | | | | | |
| Cash & equivalents | $12.2 | 100.0% | 100.0% | $12.2 | $12.2 |
| Restricted cash | 4.0 | – | – | - | - |
| Accounts receivable, net | 42.5 | 70.0% | 80.0% | 29.7 | 34.0 |
| Intercompany receivable [1] | 161.3 | – | – | 35.5 | 42.9 |
| Prepaid expenses | 6.3 | – | – | - | - |
| Deferred mob charges | 3.4 | – | – | - | - |
| Other current assets | 1.9 | – | – | - | - |
| **Total current assets** | **$231.6** | | | **$77.5** | **$89.1** |
| *Non-current assets* | | | | | |
| PP&E, net | $135.0 | 35.0% | 45.0% | $47.3 | $60.8 |
| Multi-client data library, net | 21.7 | 50.0% | 60.0% | 10.8 | 13.0 |
| Other intangible assets, net | 0.4 | – | 25.0% | - | 0.1 |
| Investment in subsidiaries | 811.1 | – | – | - | - |
| Deferred issue costs | 9.7 | – | – | - | - |
| Intercompany receivable | 17.4 | – | – | - | - |
| **Total non-current assets** | **$995.2** | | | **$58.1** | **$73.9** |
| **Total value available for distribution** | **$1,226.8** | | | **$135.6** | **$163.0** |
| *Liquidation fees & expenses* | | | | | |
| Trustee fees [2] | | | | $3.5 | $4.2 |
| Wind-down expenses [3] | | | | 10.0 | 10.0 |
| **Total remaining distributable value** | | | | **$122.1** | **$148.8** |
| *Claims waterfall* | | | | | |
| Revolving Credit Facility | | | | $50.0 | $50.0 |
| Accrued & unpaid interest | | | | 1.4 | 1.4 |
| *% recovery* | | | | *100.0%* | *100.0%* |
| **Total remaining distributable value** | | | | **$70.7** | **$97.4** |
| Senior Secured Notes | | | | $300.0 | $300.0 |
| Accrued & unpaid interest | | | | 17.1 | 17.1 |
| *% recovery* | | | | *22.3%* | *30.7%* |
| **Total remaining distributable value** | | | | **$0.0** | **$0.0** |
| Estimated admin claims | | | | $10.0 | $10.0 |
| *% recovery* | | | | *–* | *–* |
| **Total remaining distributable value** | | | | **$0.0** | **$0.0** |
| General unsecured claims | | | | $22.4 | $22.4 |
| *% recovery on other unsecured claims* | | | | *–* | *–* |
| **Total remaining distributable value** | | | | **$0.0** | **$0.0** |
| Series B-1 Senior Convertible Preferred Stock | | | | $93.5 | $93.5 |
| Series C-1 Senior Convertible Preferred Stock | | | | 47.6 | 47.6 |
| Series D Junior Preferred Stock | | | | 37.8 | 37.8 |
| *% recovery on Preferred Stock* | | | | *–* | *–* |
| **Total remaining distributable value** | | | | **$0.0** | **$0.0** |
| Common Stock | | | | $1.0 | $1.0 |
| *% recovery on Common Stock* | | | | *–* | *–* |
| **Total remaining distributable value** | | | | **$0.0** | **$0.0** |

1 Includes residual value associated with the excess of non-petitioner assets over non-petitioner liabilities
2 3.5% of the value of the Debtors' assets in a liquidation, assumed to be paid prior to any distributions of claims
3 $10.0 million assumed to be paid prior to any distributions of claims

3

<u>Balance sheet assets</u>

*Cash & equivalents*
Cash consists of all unrestricted cash in the Company's operating accounts as of December 31, 2012. Cash is assumed to be fully recoverable.

*Restricted Cash*
Restricted Cash consists of short-term investments, primarily certificates of deposit carried at cost. In the normal course of business, this amount is primarily comprised of cash collateral for letters of credit and performance guarantees. Restricted cash is assumed not to have any recoveries in the liquidation.

*Accounts receivable, net*
The Debtors' accounts receivable consist primarily of trade receivables extended to customers. The effect of a liquidation and specific costs incurred to collect on those receivables would impact recovery levels. The Company has numerous operations around the world that may affect the recovery of these receivables. An estimated recovery of 70% - 80% has been applied to the estimated receivables amount as of December 31, 2012.

*Intercompany Receivable (current and long term)*
Intercompany accounts on an individual Debtor basis consolidate to $0, as recovery on these claims is assumed to be *pari passu* with other Unsecured Claims against the Debtors. The value that does get consolidated to a positive recovery is the residual value of each non-Debtor subsidiary after satisfaction of any claims of the non-Debtor subsidiaries. Based on non-Debtor balance sheet information, the low- and high-end recoveries that flow through to the Debtors are $35.5 million and $42.9 million, respectively.

*Prepaid expenses and deferred mobilization charges*
There are no recoveries assumed for prepaid expenses and deferred mobilization charges.

*Other current assets*
Other current assets are comprised of deposits in the form of deposits to professional services firms. The recovery rates to such accounts are assumed to be 0% in liquidation.

*Plant and equipment, net*
The Debtors' plant and equipment represent book value amounts of field operating equipment, vehicles, buildings, software, data processing equipment, and furniture and equipment. Sale of these assets would be negatively impacted in liquidation, and a 35% to 45% recovery estimate has been applied.

*Multi-client data library, net*
The multi-client data library consists of seismic surveys that are licensed to customers on a non-exclusive basis. Costs that are directly associated with acquiring and processing the data are capitalized, and as such all revenues are cash accretive. Recovery ratios to the data library were calculated to be approximately 50% - 60%.

*Other intangible assets, net*
Other intangible assets include license agreements to which 0% - 25% recovery was applied.

*Investment in subsidiaries*
Investment in subsidiaries relates to foreign subsidiaries, and there is no value attributed to discontinued operations. Any residual value based on liquidation values at the foreign subsidiary level flows through to the intercompany receivable item as a current asset, assuming the wind down occurs within one-year period.

*Deferred issue costs*
Deferred issue costs are associated with various fees and commissions paid in issuing debt, capitalized as an asset. A recovery of 0% has been applied to the estimated deferred issue costs as of December 31, 2012.

**Liquidation expenses**

*Trustee fees*
The liquidation analysis assumes that a Chapter 7 trustee would receive fees as payment for administering the Chapter 7 cases. These fees are assumed to be paid prior to any distribution to creditors and are assumed to be 3.5% of the total dollar amount of the Debtors' pre-petition asset values, exclusive of foreign intercompany recoveries.

*Wind-down expenses*
The estimated wind-down expenses include amounts for certain payroll and other employee payroll and benefits, real estate carrying costs, and other expenses incurred during the asset disposition period. These expenses are assumed to be $10 million to cover the liquidation process and to be paid prior to any distribution to creditors.

**Claims**

*Secured Claims*
Holders of secured claims are entitled to recover all amounts generated from the disposition of their collateral, up to the amount of their allowed claim. In the instant case, secured claims are assumed to include the Credit Facility and the Notes. Estimated amounts to be distributed to secured creditors reflect balances due and accrued and unpaid interest on the Credit Facility and the Notes.

*Estimated Admin Claims*
Holders of Priority Tax Claims and certain unsecured claims, including federal taxes, sales and local income taxes, and foreign taxes, are entitled to recover before holders of general unsecured claims are entitled to recover. Based on estimated recoveries under this hypothetical liquidation scenario, no proceeds would be available to satisfy Priority Tax Claims.

*General Unsecured Claims*
The estimated amount of Unsecured Claims against the Debtors include, but are not limited to, trade creditors and amounts owed to lessors and other creditors. Based on estimated recoveries under this hypothetical liquidation scenario, no proceeds would be available to satisfy the Debtors' Unsecured Claims.

*Preferred Equity*
The Preferred Equity Holders are entitled to a recovery if sufficient assets exist to satisfy the Debtors' Unsecured Claims in full. Based on estimated recoveries under this hypothetical liquidation scenario, no proceeds would be available to satisfy these claims.

*Common Equity*
Holders of Other Equity Interests are entitled to a recovery if sufficient assets exist to satisfy the Debtors' obligations to their Preferred Equity Holders in full. In this hypothetical liquidation scenario, no proceeds would be available for distribution to the Holders of Other Equity Interests.


THE DEBTORS' LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE ASSETS OF THE DEBTORS. UNDERLYING THE LIQUIDATION ANALYSIS ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE. IN ADDITION, VARIOUS LIQUIDATION DECISIONS UPON WHICH CERTAIN ASSUMPTIONS ARE BASED ARE SUBJECT TO CHANGE. THEREFORE, THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS AND ESTIMATES EMPLOYED IN DETERMINING THE LIQUIDATION VALUES OF THE DEBTORS WILL RESULT IN AN ACCURATE ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED WERE THE DEBTORS TO UNDERGO AN ACTUAL LIQUIDATION. GENERAL UNSECURED CLAIMS AGAINST THE ESTATES COULD VARY SIGNIFICANTLY FROM THE ESTIMATES SET FORTH HEREIN, DEPENDING ON THE CLAIMS ASSERTED DURING THE PENDENCY OF THE CHAPTER 7 CASE. MOREOVER, THIS LIQUIDATION

5

ANALYSIS DOES NOT INCLUDE LIABILITIES THAT MAY ARISE AS A RESULT OF LITIGATION, CERTAIN NEW TAX ASSESSMENTS, OR OTHER POTENTIAL CLAIMS. THIS ANALYSIS ALSO DOES NOT INCLUDE POTENTIAL RECOVERIES FROM AVOIDANCE ACTIONS. NO VALUE WAS ASSIGNED TO ADDITIONAL PROCEEDS THAT MIGHT RESULT FROM THE SALE OF CERTAIN ITEMS WITH INTANGIBLE VALUE. THEREFORE, THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS COULD VARY MATERIALLY FROM THE ESTIMATES PROVIDED HEREIN.

**EXHIBIT D**

**FINANCIAL PROJECTIONS**

## EXHIBIT D

### FINANCIAL PROJECTIONS

RESPONSIBILITY FOR, AND PURPOSE OF, THE PROJECTIONS

As a condition to confirmation of a plan of reorganization, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation of a proposed plan is not likely to be followed by a liquidation or the need for further financial reorganization of the debtor. In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management has, through the development of the financial projections contained herein (the "Projections"), analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan while maintaining sufficient liquidity and capital resources to conduct their businesses. The Projections were also prepared to assist the holders of Allowed Note Claims or Allowed Senior Preferred Equity Interests in determining whether to accept or reject the Plan. The Projections were prepared based on the expected results of the Reorganized Debtors and their non-filing subsidiaries (collectively, the "Reorganized Company"). *See* Section IV of the Disclosure Statement, "Risk Factors," for further discussion of the risks associated with the Projections.

The Projections should be read in conjunction with all of the assumptions, qualifications, and comments to the table containing the Projections, the historical consolidated financial information (including the notes and schedules thereto), other information in the public filings of GOK, and the Plan and Disclosure Statement. The Projections were prepared in good faith based on assumptions believed to be reasonable and applied in a manner consistent with past practice. A significant number of assumptions used in the Projections about the operations of the Debtors' businesses after the Petition Date were based, in part, on economic, competitive, and general business conditions prevailing at the time the Projections were developed. While as of the date of the solicitation of the Disclosure Statement, such conditions have not materially changed, any future changes in these conditions may materially impact the ability of the Reorganized Company to achieve the Projections.

The Company is currently in the process of revising its 2013 budget, it is currently anticipated that the 2013 budget will be below the Debtors' Projections.

SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

Except for historical information, statements contained in the Disclosure Statement and incorporated by reference in it, including the Projections, may be considered "forward-looking statements" within the meaning of federal securities laws. Such forward-looking statements relate to the plans and objectives of the Debtors or future operations. In light of the risks and uncertainties inherent in all future projections and the Debtors' financial position, the inclusion of forward-looking statements should not be regarded as a representation by the ebtors that the objectives or plans of the Reorganized Company will be achieved. Many factors could cause the Reorganized Company's actual results to differ materially from those in the forward-looking statements, including: (i) the ability to consummate the reorganization through a consensual pre-packaged or pre-arranged bankruptcy; (ii) the ability of the Debtors to continue operating as a going concern and successfully emerge from chapter 11 pursuant to a feasible chapter 11 reorganization plan that provides for the Debtors to remain substantially intact; (iii) timing, execution, and results of the Debtors' restructuring or refinancing process; (iv) the Debtors' and the Reorganized Company's ability, and the ability of their management team, to carry out their business strategies; (v) the Reorganized Company's ability to maintain liquidity and to have sufficient funds to carry out its business program; (vi) the Debtors' ability to sell to existing customers and identify and participate in sales to new customers in light of the current uncertainty surrounding the Debtors' financial position; (vii) the continuation of adverse financial results and substantial competition in the Debtors' businesses; (viii) the Debtors' ability to retain and attract experienced management and other key management personnel; (ix) the Debtors' ability to successfully implement initiatives designed to improve and retain their customer base; (x) the Debtors' ability to attract and retain key customers within Proprietary Data Acquisition, Multi-Client Data Acquisition, and Data Processing and Integrated Reservoir Geosciences; (xi) the risk of adverse political acts or developments in the Debtors' existing and future international

markets; (xii) fluctuations in foreign currency exchange rates affecting the Debtors' translation of operating results; (xiii) continued or increased competition; (xiv) changes in oil prices and corresponding demand for the Debtors' services; (xv) the decline in general economic conditions; (xvi) adverse judgments in pending or future litigation; and (xvii) changes in interest and exchange rates.

The foregoing review of important factors should not be construed as exhaustive and should be read in conjunction with other cautionary statements that are included elsewhere in this document, the Plan, and the Disclosure Statement. The Debtors and the Reorganized Company undertake no obligation to release publicly the results of any future revisions they may make to forward-looking statements to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

INTRODUCTION

The Debtors' management has developed the Projections (summarized below) to assist stakeholders in their evaluation of the Plan and to analyze its feasibility. The Projections are based on a number of significant assumptions which are described below. Actual operating results and values may and likely will vary from those projected. The Projections were prepared based on the expected results of the Reorganized Company, which includes the Debtors and their non-filing subsidiaries. The current version of the Projections was prepared in November 2012.

The key points from the Projections are summarized below.

FINANCIAL PROJECTIONS

The table below provides a summary of the Company's Projections:

|  | Q1 2013 | Q2 2013 | Q3 2013 | Q4 2013 | 2013P |
|---|---|---|---|---|---|
| NA Data Acquisition | $32.5 | $20.5 | $27.5 | $48.9 | $129.4 |
| Int'l Data Acquisition | 69.9 | 88.4 | 64.0 | 47.7 | 270.0 |
| Multi-client | 19.6 | 27.5 | 23.2 | 23.0 | 93.3 |
| Data processing | 3.8 | 4.2 | 4.0 | 4.2 | 16.2 |
| **Total revenue** | **$125.8** | **$140.6** | **$118.7** | **$123.8** | **$508.9** |
| NA Data Acquisition | ($25.3) | ($19.8) | ($24.6) | ($37.8) | ($107.5) |
| Int'l Data Acquisition | (63.5) | (66.8) | (51.6) | (40.9) | (222.8) |
| Multi-client | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Data processing | (3.1) | (3.2) | (3.3) | (3.3) | (12.9) |
| **Total operating expenses** | **($91.9)** | **($89.8)** | **($79.5)** | **($82.0)** | **($343.2)** |
| NA Data Acquisition | $7.2 | $0.7 | $2.8 | $11.0 | $21.7 |
| Int'l Data Acquisition | 6.4 | 21.6 | 12.5 | 6.9 | 47.4 |
| Multi-client | 19.6 | 27.5 | 23.2 | 23.0 | 93.3 |
| Data processing | 0.7 | 1.0 | 0.7 | 0.9 | 3.3 |
| **Total gross margin** | **$33.9** | **$50.8** | **$39.2** | **$41.8** | **$165.7** |
| NA Data Acquisition | $6.3 | $0.0 | $2.0 | $10.2 | $18.5 |
| Int'l Data Acquisition | 1.9 | 17.2 | 8.2 | 2.6 | 29.9 |
| Multi-client | 19.0 | 26.9 | 22.6 | 22.4 | 90.9 |
| Data processing | 0.7 | 0.9 | 0.7 | 0.9 | 3.2 |
| Corporate | (9.0) | (8.9) | (8.9) | (8.8) | (35.6) |
| **Total EBITDA** | **$18.9** | **$36.1** | **$24.6** | **$27.3** | **$106.9** |

EBITDA (earnings before interest, taxes, depreciation and amortization) is not a measure of performance calculated in accordance with GAAP. The Debtors' management believes that EBITDA is a widely accepted financial indicator of a company's operational performance and its ability to incur and service debt, and fund capital

expenditures. EBITDA is not a measure calculated in accordance with GAAP, as it does not include deductions for items such as depreciation, interest and income taxes, which are necessary to maintain the Company's business. EBITDA should not be considered in isolation or as a substitute for operating income, net income or loss, cash flows provided by or used in operating, investing and financing activities, or other income or cash flow statement data prepared in accordance with GAAP. EBITDA calculations may vary among entities, so the Company's computation may not be comparable to EBITDA measures of other entities. The Debtors' management believes that presenting EBITDA as supplemental information will enhance investors' understanding of cash flows for the periods presented. There are significant limitations to using EBITDA as a measure of performance, including the inability to analyze the effect of certain recurring and non-recurring items that materially affect our net income or loss, and the lack of comparability of results of operations of different companies. The EBITDA Projections were prepared on an aggregated basis and, as a result, the Debtors have not provided any corresponding net income (loss) Projections or a reconciliation of EBITDA to net income (loss).

EBITDA may not be a good proxy for cashflow of the business and the cashflow of the business may vary materially from the projected EBITDA.

MAJOR ASSUMPTIONS

Management's assumptions are categorized into the following segments: North America Data Acquisition, International Data Acquisition, Data Processing, North America Multi-client, 2013 Liquidity, Impact of Chapter 11 Filing, and Overall / General Operations Assumptions.

North America Data Acquisition segment:

1. Existing North America data acquisition and multi-client contracts are forecast to remain in place as contracted.
2. The Projections assume a highly competitive U.S. data acquisition market with some pricing pressure.
3. U.S. data acquisition operations are negatively impacted by the Chapter 11 Cases in 2nd and 3rd quarter 2013 with an expected recovery during 4th quarter 2013 to historical activity levels.

International Data Acquisition segment:

4. The Projections assume minimal impact on the Company's international data acquisition segment from the Chapter 11 Cases.

Data Processing segment:

5. Data Processing activity and profitability assumed to remain at historical levels.

North America Multi-client segment:

6. The Projections assume that existing North America data acquisition and multi-client contracts remain in place as contracted.
7. Pre-funding levels for multi-client projects are forecast to exceed 80%.
8. The Projections assume minimal impact on the Company's multi-client segment from the filing of the Chapter 11 Cases.

2013 liquidity:

9. The Company has sufficient liquidity to meet its working capital and capital expenditure requirements.

Impact of Chapter 11 filing:

10. The Projections assume minimal impact on the Company's international data acquisition and multi-client operations from the Chapter 11 Cases.

11. U.S. data acquisition operations are negatively impacted by the Chapter 11 filing in 2nd and 3rd quarter 2013 with an expected recovery during 4th quarter 2013 to historical activity levels.

Overall / general operations assumptions:

12. The Company continues to replace backlog to historical level beginning in 4th quarter 2013.

13. The Projections include approximately $29 million of capital expenditures (excluding investment in multi-client data library).

14. The North American crew schedule assumes 10 crews, including 4 seasonal crews in Canada.

15. The international crew schedule assumes 9 crews in 7 countries, including one Transition Zone and one Ocean Bottom Cable operation.

16. Cost savings are realized from the continued centralization of support functions and consolidation of operations to core countries

17. No significant asset sales or divestitures are assumed in the Projections.

18. Chapter 11 restructuring costs are excluded.

19. Normal employee turnover levels are forecast with no significant loss of key employees.

20. No significant deviation from historical global weather patterns.

21. Political environment is assumed to be stable for the countries in which the Company operates, mitigating cash generation and repatriation risk. This is coupled with no significant changes forecast in local laws and regulations for the countries in which the Company operates.

THE PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE DEBTORS' INDEPENDENT ACCOUNTANT HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE ITS REASONABLENESS AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL INFORMATION.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS, OR CASH FLOWS. ACCORDINGLY, NEITHER THE DEBTORS NOR THE REORGANIZED COMPANY INTEND TO, AND EACH DISCLAIMS ANY OBLIGATION TO: (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO HOLDERS OF NEW COMMON STOCK OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE; (B) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC; OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THE PROJECTIONS HAVE BEEN PREPARED EXCLUSIVELY BY THE DEBTORS' MANAGEMENT. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS AND THE REORGANIZED COMPANY. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE REORGANIZED COMPANY'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING AFTER THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. YOU MAY NOT, THEREFORE, RELY ON THESE PROJECTIONS AS A GUARANTEE OR OTHER ASSURANCE OF THE FUTURE PERFORMANCE OF THE REORGANIZED COMPANY. THE NUMERICAL INFORMATION IN THESE

4

PROJECTIONS HAS BEEN PREPARED BY THE DEBTORS AND DOES NOT CONSTITUTE A REPRESENTATION OR ENDORSEMENT OF SUCH INFORMATION BY THE NOTEHOLDERS OR ANY OF THE DEBTORS' OTHER STAKEHOLDERS.

**EXHIBIT E**

**VALUATION ANALYSIS**

**EXHIBIT E**

**VALUATION ANALYSIS**

**A. Overview**

The Debtors have been advised by Rothschild Inc. ("Rothschild"), their investment banker, with respect to the reorganization value of reorganized Geokinetics Inc. and its affiliated Debtors on a going concern basis as of January 11, 2013.

In preparing its analysis, Rothschild has, among other things: (i) reviewed certain recent publicly available financial results of the Debtors; (ii) reviewed certain internal financial and operating data of the Debtors, including the business plan projections prepared and provided by the Debtors' management relating to its businesses and its prospects; (iii) discussed with certain senior executives the current operations and prospects of the Debtors; (iv) reviewed certain operating and financial forecasts prepared by the Debtors, including the business plan projections in this Disclosure Statement (the "Projections"); (v) discussed with certain senior executives of the Debtors key assumptions related to the Projections; (vi) considered the market value of certain publicly-traded companies in businesses reasonably comparable to the operating businesses of the Debtors; (vii) considered the value assigned to certain precedent transactions for businesses similar to the Debtors; and (viii) conducted such other analyses as Rothschild deemed necessary under the circumstances. Rothschild assumed, without independent verification, the accuracy, completeness, and fairness of all of the financial and other information available to it from public sources or as provided to Rothschild by the Debtors or their representatives. Rothschild also assumed that the Projections have been reasonably prepared on a basis reflecting the Debtors' best estimates and judgment as to future operating and financial performance. Rothschild did not make any independent evaluation or appraisal of the Debtors' assets or liabilities, nor did Rothschild verify any of the information it reviewed. In addition, Rothschild did not independently verify management's Projections in the business plan in connection with Rothschild's estimates of the reorganization value and equity value, and no independent valuations or appraisals of Debtors were sought or obtained in connection herewith. Estimates of the reorganization value and equity value do not purport to be appraisals or necessarily reflect the values that may be realized if assets are sold as a going concern, in liquidation, or otherwise. In the case of the Reorganized Debtors, the estimates of the reorganization value prepared by Rothschild represent the hypothetical reorganization value of the Reorganized Debtors. Such estimates were developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to creditors thereunder. Such estimates reflect computations of the range of the estimated reorganization value of the Reorganized Debtors through the application of various valuation techniques and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. To the extent the valuation is dependent upon the Reorganized Debtors' achievement of the Projections, the valuation must be considered speculative. Rothschild does not make any representation or warranty as to the fairness of the terms of the Plan.

In addition to the foregoing, Rothschild relied upon the following assumptions with respect to the valuation of the Debtors:

- The Debtors are successfully reorganized with an assumed emergence date of April 1, 2013;
- The Debtors are able to emerge from the restructuring process with a viable capital structure and adequate liquidity;
- The Debtors successfully perform to the levels specified in their business plan;
- No significant disruption of operations (*e.g.*, no unanticipated customer losses);
- The Debtors avoid a prolonged restructuring process, which would likely reduce the overall valuation; and
- Capital markets consistent with those that exist as of January 11, 2013.

**B. Valuation Methodology: Comparable Company Analysis**

The following is a brief summary of certain financial analyses performed by Rothschild to arrive at its range of estimated enterprise value and equity value. Rothschild's valuation analysis must be considered as a whole. The summary set forth below does not purport to be a complete description of the analyses performed by Rothschild.

A comparable public company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company. It establishes a benchmark for asset valuation by deriving the value of "comparable" assets, standardized using a common variable such as revenues, earnings, and cash flows. The analysis includes a detailed multi-year financial comparison of each company's income statement, balance sheet, and cash flow statement. In addition, each company's performance, profitability, margins, leverage, and business trends are also examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses, business risks, target market segments, growth prospects, maturity of businesses, market presence, size and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation; however, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value. In performing the comparable public company analysis, the following publicly traded companies deemed generally comparable to the Debtors in some or all of the factors described above, were selected:

- North American seismic data acquisition comparable companies: Dawson Geophysical Co., TGC Industries, Inc., and Global Geophysical Services, Inc.

- International seismic data acquisition comparable companies: CGG Veritas, Petroleum Geo Services ASA, and TGS Nopec Geophysical Co.

Based on the higher relative size and the differences in the business models of the international seismic companies, the North American seismic data acquisition comparable companies were deemed to be more closely related to the Debtors.

Rothschild has utilized the median consensus of analyst estimates for 2012 earnings before interest, taxes, depreciation and amortization ("EBITDA"). Rothschild also reviewed individual analyst reports for EBITDA forecasts. Rothschild analyzed the current trading values for the comparable companies as a multiple of forecasted EBITDA for the year ending 2012. Rothschild also reviewed other relevant multiples including Adjusted EBITDA when determining the enterprise value for the Debtors. Rothschild employed an EBITDA multiple range of 2.5x - 3.5x for 2012 results. These multiples were then applied to the Debtors' forecast financial EBITDA to determine the range of enterprise values.

To support the comparable public company analysis, Rothschild also reviewed several recent transactions in the seismic industry. Many of the transactions reviewed provided a consistent valuation multiple range as utilized in the comparable public company analysis.

Rothschild did not rely on a discounted cash flow ("DCF") analysis in this case due to the absence of a long-term business plan. The DCF estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. The DCF discounts the expected cash flows by a theoretical or observed discount rate. This approach has two components: (i) calculating the present value of the projected unlevered after-tax free cash flows for a determined period of time and (ii) adding the present value of anticipated future cash flows after the projection period, or the terminal value.

### C. Estimated Range of Reorganized Value of the Reorganized Debtors

Solely for purposes of the Disclosure Statement, the Plan Value is $280 million. This is within the estimated range of a reorganization value of the Reorganized Debtors, which Rothschild estimates to be approximately $260 million to $365 million. Rothschild's estimate of a range of reorganization values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

Assuming a Plan Value of $280 million, the value of the New Common Stock to be distribution pursuant to the Plan is $224 million. Based upon the assumed combined range of the reorganization value of the Reorganized Debtors of between $260 million and $365 million, assumed net debt of $56 million (including $50 million of exit financing and an additional $6 million of funding for the Class 7 Distribution), Rothschild has employed an imputed estimate of the range of equity value for the Reorganized Debtors between approximately $204 million and $309 million. The Plan Value for the purposes of this Disclosure Statement is $280 million.

2

|  | Plan | Valuation Range | |
|---|---|---|---|
|  | Value | Low | High |
| Enterprise Value Range | $280.0 | $260.0 | $365.0 |
| Net Debt | (56.0) | (56.0) | (56.0) |
| **Equity Value** | **$224.0** | **$204.0** | **$309.0** |
| Discount to Plan Value | 20.0% | | |
| **Discounted Equity Value** | **$179.2** | | |
| | | | |
| **DIP Facility converted to equity** | **$25.0** | | |
| | | | |
| DIP Facility Converted Equity Ownership [1] | 14.0% | | |
| Senior Secured Notes Equity Ownership | 86.0% | | |
| **Total** | **100.0%** | | |

Notes:
(1) DIP Facility Converted Equity Ownership is calculated as
amount of DIP outstanding divided by the discounted equity value

Any variance to the business plan could have a material impact on the valuation and recoveries achieved. These estimated ranges of values and recoveries are based on a hypothetical value that reflects the estimated intrinsic value of the Debtors derived through the application of various valuation methodologies. The implied reorganized equity value ascribed in this analysis does not purport to be an estimate of the post-reorganization market trading value. Such trading value may be materially different from the implied reorganized equity value ranges associated with Rothschild's valuation analysis. Rothschild's estimate is based on economic, market, financial, and other conditions as they exist on, and on the information made available as of January 11, 2013. It should be understood that, although subsequent developments, before or after the Confirmation Hearing, may affect Rothschild's conclusions, Rothschild does not have any obligation to update, revise, or reaffirm its estimate. The summary set forth above does not purport to be a complete description of the analyses performed by Rothschild. The preparation of an estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily susceptible to summary description. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimate of implied reorganized equity value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. In addition, estimates of implied reorganized equity value do not purport to be appraisals, nor do they necessarily reflect the values that might be realized if assets were sold. The estimates prepared by Rothschild assume that the Reorganized Debtors will continue as the owner and operator of their businesses and assets, and that such assets are operated in accordance with the Debtors' business plan. Depending on the results of the Debtors' operations or changes in the financial markets, Rothschild's valuation analysis as of the Effective Date may differ materially from that disclosed herein.

In addition, the valuation of newly issued securities, such as the New Common Stock, is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by other factors not possible to predict. Accordingly, the implied reorganized equity value estimated by Rothschild does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets.

THE FOREGOING VALUATION IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR THE REORGANIZED DEBTORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE VALUATION WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE. THE DEBTORS' PROJECTIONS ON WHICH THE VALUATION WAS BASED ARE UNAUDITED AND MAY NOT HAVE BEEN PREPARED IN COMPLIANCE WITH ACCOUNTING PRINCIPALS, INCLUDING GAAP. THE DEBTORS ARE CURRENTLY IN THE PROCESS OF REVISING THE 2013 BUDGET, TO THE EXTENT THE REVISED

BUDGET IS BELOW THE DEBTORS' PROJECTIONS IT MAY HAVE A NEGATIVE EFFECT ON THE VALUATION.

THE ASSUMED RANGE OF TOTAL ENTERPRISE VALUE ASSUMES THAT THE COMPROMISE AND SETTLEMENT OF ISSUES BETWEEN THE NOTEHOLDERS AND HOLDERS OF SENIOR PREFERRED EQUITY INTERESTS AS SET FORTH IN THE PLAN IS CONSUMMATED.

THE ESTIMATED CALCULATION OF ENTERPRISE VALUE IS HIGHLY DEPENDENT UPON ACHIEVING THE FUTURE FINANCIAL RESULTS AS SET FORTH IN THE DEBTORS' BUSINESS PROJECTIONS, AS WELL AS THE REALIZATION OF CERTAIN OTHER ASSUMPTIONS, NONE OF WHICH ARE GUARANTEED AND MANY OF WHICH ARE OUTSIDE OF THE DEBTORS' CONTROL. THE FOREGOING VALUATION COULD BE MATERIALLY AFFECTED BY THE RISK FACTORS DISCUSSED IN ARTICLE IV OF THE DISCLOSURE STATEMENT.

THE CALCULATIONS OF VALUE SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE EQUITY VALUE STATED HEREIN DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. SUCH VALUE, IF ANY, MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZED EQUITY VALUE RANGES ASSOCIATED WITH THIS VALUATION ANALYSIS. NO RESPONSIBILITY IS TAKEN BY ROTHSCHILD FOR CHANGES IN MARKET CONDITIONS AND NO OBLIGATIONS ARE ASSUMED TO REVISE THIS CALCULATION OF THE DEBTORS' VALUE TO REFLECT EVENTS OR CONDITIONS THAT SUBSEQUENTLY OCCUR. THE CALCULATIONS OF VALUE DO NOT CONFORM TO THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE OF THE APPRAISAL FOUNDATION.

**EXHIBIT F**

**RESTRUCTURING SUPPORT AGREEMENT**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT is made and entered into as of January 15, 2013 (the "Agreement") by and among (i) Geokinetics Inc. on behalf of itself and each of its direct and indirect domestic subsidiaries and affiliates (collectively, the "Company"), which include: (a) Geokinetics Holdings USA, Inc., (b) Geokinetics Services Corp., (c) Geokinetics Processing, Inc., (d) Geokinetics Acquisition Company, (e) Geokinetics USA, Inc., (f) Geokinetics International Holdings, Inc., (g) Geokinetics Management, Inc., (h) Geokinetics International, Inc., and (i) Advanced Seismic Technology, Inc.; (ii) American Securities Opportunities Advisors, LLC ("American Securities"), Gates Capital Management, Inc. ("Gates") and the other undersigned holders (the "Noteholders"), each as the beneficial owners (or advisor, nominee or investment manager for beneficial owner(s)) of the 9.75% Senior Secured Notes due 2014 issued by Geokinetics Holdings USA, Inc. (the "Notes") and, if and as applicable, as lenders under that certain Amended and Restated Credit Agreement dated as of August 12, 2011 (the "Revolving Credit Facility"); and (iii) Avista Capital Partners, L.P. and Avista Capital Partners (Offshore), L.P. (the "Preferred Equity Holders" and, together with the Company and the Noteholders, each referred to as a "Party" and collectively referred to as the "Parties"), each as the beneficial owners (or advisor, nominee or investment manager for beneficial owner(s)) of preferred equity interests in Geokinetics Inc. comprised of Series B-1 Senior Convertible Preferred Stock and Series C-1 Senior Preferred Stock (collectively, the "Preferred Equity") as well as junior preferred equity interests in Geokinetics Inc. comprised of Series D Junior Preferred Stock (the "Series D Preferred Stock").

### WITNESSETH:

WHEREAS, representatives of the Company, Noteholders, and Preferred Equity Holders have agreed to the terms of a financial restructuring of the Company's indebtedness and other obligations (the "Restructuring"), the principal terms of which are set forth in this Agreement and the accompanying term sheet, including exhibits, attached hereto as Exhibit A (the "Restructuring Term Sheet");

WHEREAS, the Company intends to (i) commence voluntary cases (collectively, the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), (ii) file and use its reasonable best efforts to obtain confirmation by the Bankruptcy Court of a chapter 11 plan of reorganization in the Chapter 11 Case that is consistent with the Restructuring Term Sheet and implements the terms of the Restructuring (such plan of reorganization, the "Chapter 11 Plan"), and (iii) file and use its reasonable best efforts to obtain approval by the Bankruptcy Court of a disclosure statement and related materials for the Chapter 11 Plan that are consistent with the Restructuring Term Sheet (the "Disclosure Statement");

WHEREAS, this Agreement and the Restructuring Term Sheet, which is incorporated herein by reference and is made part of this Agreement, set forth the agreement among the Parties concerning their commitment, subject to the terms and conditions hereof and thereof, to implement the Restructuring. In the event the terms and conditions as set forth in the Restructuring Term Sheet and this Agreement are inconsistent, the terms and conditions contained in the Restructuring Term Sheet shall govern.

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

Section 1.    General. Each of the Parties agrees and covenants that, on the terms and subject to the conditions set forth on the Restructuring Term Sheet:

(a)    it will negotiate in good faith (i) the documentation regarding the Restructuring or otherwise contemplated by the Restructuring Term Sheet, (ii) the Chapter 11 Plan, and (iii) the other documents contemplated hereby and thereby, and will use its reasonable best efforts to proceed expeditiously to complete such documents to the extent possible prior to the Chapter 11 Commencement Date (as defined below);

(b)    it will not (i) object to, delay, impede, commence any proceeding, or take any other action to interfere, directly or indirectly, in any material respect with the acceptance or implementation of the Chapter 11 Plan, (ii) vote for, consent to, support, encourage, induce or participate in any way in the formulation of any other plan of reorganization or liquidation to be proposed, proposed or filed in any chapter 11 or chapter 7 case or under the insolvency laws of any foreign jurisdiction commenced in respect of the Company, (iii) directly or indirectly, in whatever jurisdiction, seek, solicit, support, induce, facilitate, encourage or engage in discussions with any person or entity concerning any other plan, sale, proposal, or offer of dissolution, winding up, liquidation, administration, reorganization, composition, arrangement, merger, consolidation or restructuring of the Company that could reasonably be expected to prevent, delay or impede the success of the Restructuring contemplated by the Chapter 11 Plan or the Restructuring Term Sheet, (iv) participate itself, or in conjunction with others in the commencement of any involuntary bankruptcy proceedings against the Company, (vi) seek the appointment of a trustee or examiner under section 1104 of the Bankruptcy Code or the conversion or dismissal of the Chapter 11 Case under section 1112 of the Bankruptcy Code, or (vii) take any other action, in the Chapter 11 Case or otherwise and in whatever jurisdiction, that is inconsistent with, or is intended or is reasonably likely to interfere with or impede or delay, confirmation of the Chapter 11 Plan and consummation of the Restructuring;

(c)    it will take or cause to be taken all reasonable actions necessary to confirm and consummate the Chapter 11 Plan on the terms and subject to the conditions set forth in this Agreement and on the Restructuring Term Sheet.

Section 2.    Support for the Chapter 11 Plan.

(a)    Except as otherwise provided in this Agreement, the Company agrees and covenants that (i) it shall perform its commitments and other obligations under the Restructuring Term Sheet and (ii) in connection with the commencement of the Chapter 11 Case, it shall use its reasonable best efforts to (A) launch the solicitation of votes to accept or reject the Chapter 11 Plan required for confirmation of the Chapter 11 Plan (the "Solicitation") prior to the date of the filing of the Company's chapter 11 petitions (the "Chapter 11 Commencement Date"); provided, however, that if the Majority Noteholders (as defined below) determine that the Company should pursue a pre-negotiated Chapter 11 Plan rather than a prepackaged Chapter 11 Plan, such Solicitation shall be performed by the Company during the Chapter 11 Case after approval of the Disclosure Statement by the Bankruptcy Court, (B) file the Chapter 11 Plan on the Chapter 11

2

Commencement Date, (C) seek approval of the Disclosure Statement and confirmation of the Chapter 11 Plan by the Bankruptcy Court as expeditiously as possible, (D) obtain any and all required regulatory and/or third-party approvals for the Restructuring, (E) not take any actions inconsistent with this Agreement, the Restructuring Term Sheet or the Chapter 11 Plan, and (F) take all other necessary actions to support the Chapter 11 Plan provided that nothing herein shall require the Company or its officers or directors to breach its, his or her fiduciary duties.

(b)     Except as otherwise provided in the Agreement, each of the Preferred Equity Holders agrees and covenants that it shall (i) perform its commitments and other obligations under this Agreement and the Restructuring Term Sheet, (ii) not object to any motions to be filed by the Company in connection with the Chapter 11 Case, so long as such motions are not inconsistent with the treatment of the Preferred Equity Holders as set forth in the Restructuring Term Sheet, (iii) not object to the Disclosure Statement, the solicitation of votes to accept the Chapter 11 Plan or confirmation of the Chapter 11 Plan, so long as the Disclosure Statement and Plan are not inconsistent with the treatment of the Preferred Equity Holders as set forth in the Restructuring Term Sheet, (iv) take or cause to be taken all reasonable actions necessary to ensure that the Company performs its commitments and other obligations under this Agreement and the Restructuring Term Sheet; (v) at every meeting of Preferred Equity Holders called, and at every adjournment or postponement thereof, and on every action or approval by written consent of the Preferred Equity Holders, if applicable, attend such meeting in person or by proxy and/or to vote in  favor of, or consent to, the approval of the Restructuring, (vi) following receipt of the solicitation materials (the "Solicitation Materials"), promptly and timely exercise all votes to which it is entitled with respect to Preferred Equity to accept the Chapter 11 Plan in accordance with the applicable procedures set forth in the Solicitation Materials (and will not withdraw or change such votes) and, to the extent such election is available, shall not elect on its ballot to preserve any claims (in respect of the claims that each Preferred Equity Holder may own) that may be affected by any releases provided for under the Chapter 11 Plan, and (vii) take or cause to be taken all reasonable actions necessary to fully cooperate with the Company and the Noteholders in implementing the terms of the Restructuring, including, without limitation, obtaining approval of the Chapter 11 Plan as expeditiously as possible.

(c)     Except as otherwise provided in the Agreement, so long as the Chapter 11 Plan is consistent with the Restructuring Term Sheet, including, without limitation, the terms of treatment of the Noteholders and other classes of creditors, each of the Noteholders agrees and covenants that it shall (i) perform its commitments and other obligations under the Restructuring Term Sheet, (ii) not object to any motions to be filed by the Company in connection with the Chapter 11 Case, so long as such motions are in form and substance substantially the same as the form approved by the Noteholders holding more than 50% of the aggregate principal amount of all Notes (the "Majority Noteholders"), (iii) not object to the Disclosure Statement, the solicitation of votes to accept the Chapter 11 Plan or confirmation of the Chapter 11 Plan, so long as the Disclosure Statement and the Chapter 11 Plan are in form and substance substantially the same as the form approved by the Majority Noteholders, (iv) following receipt of Solicitation Materials, promptly and timely exercise all votes to which it is entitled to accept the Chapter 11 Plan in accordance with the applicable procedures set forth in the Solicitation Materials (and will not withdraw or change such votes) and, to the extent such election is available, shall not elect on its ballot to preserve any claims (in respect of the claims that each Noteholder may own) that may be affected by any releases provided for under the Chapter 11 Plan, and (v) take or cause to

3

be taken all reasonable actions necessary to fully cooperate with the Company and the Preferred Equity Holders in implementing the terms of the Restructuring, including, without limitation, obtaining approval of the Chapter 11 Plan as expeditiously as possible.

(d)     Notwithstanding the foregoing, nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and the Restructuring Term Sheet and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring as set forth in the Restructuring Term Sheet.

Section 3.     Representations and Warranties.

(a)     Each of the Parties severally, and not jointly, represents and warrants to each of the other Parties that the following statements are true and correct as of the date hereof:

(1)     Power and Authority. It has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement.

(2)     Authorization. The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

(3)     No Conflicts. The execution and delivery by it, and performance by it of the transactions contemplated by this Agreement, do not and shall not (i) violate any provision of law, rule, or regulation applicable to it or its certificate of incorporation or bylaws (or other organizational documents) or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party.

(4)     Governmental Consents. Except as contemplated by this Agreement and the Restructuring Term Sheet, the execution and delivery by it, and performance by it of the transactions contemplated by this Agreement, do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with, or by, any Federal, state, or other governmental authority or regulatory body.

(5)     Binding Obligation. This Agreement is the legally valid, and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(6)     Proceedings. No litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending or threatened against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

4

(b)    Each of the Preferred Equity Holders represents and warrants, severally and not jointly, to each of the other Parties that the following statements are true, correct, and complete as of the date hereof:

(1)    Ownership. It is (i) the sole beneficial owner of the aggregate principal amount of the Preferred Equity set forth on the signature page hereto and/or the investment advisor or manager for the beneficial owners of such Preferred Equity, having the power to vote and dispose of such Preferred Equity on behalf of such beneficial owners, and (ii) entitled (for its own account or for the account of other persons claiming through it) to all of the rights and economic benefits of such Preferred Equity.

(2)    Transfers. It has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement or otherwise agreed to assign, sell, participate, grant, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in the Preferred Equity represented as owned or controlled by it on the signature pages hereto.

(c)    Each of the Noteholders represents and warrants, severally and not jointly, to each of the other Parties that the following statements are true, correct, and complete as of the date hereof:

(1)    Ownership. It is (i) the sole beneficial owner of (a) the aggregate principal amount of the Notes and (b) as applicable, the aggregate principal amount owing under the Revolving Credit Facility (the "Revolving Lender Claims") set forth on the signature page hereto and/or the investment advisor or manager for the beneficial owners of such Notes and, as applicable, Revolving Lender Claims, having the power to vote and dispose of such Notes and, as applicable, Revolving Lender Claims on behalf of such beneficial owners, and (ii) entitled (for its own account or for the account of other persons claiming through it) to all of the rights and economic benefits of such Notes and, as applicable, Revolving Lender Claims.

(2)    Transfers. It has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement or otherwise agreed to assign, sell, participate, grant, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in the Notes or, as applicable, the Revolving Lender Claims represented as owned or controlled by it on the signature pages hereto.

Section 4.    Covenants.

(a)    Each Preferred Equity Holder individually covenants that such Party shall not, directly or indirectly, (i) sell, pledge, hypothecate, or otherwise transfer any shares of (A) Preferred Equity or (B) shares of Series D Preferred Stock except to a purchaser or other entity who executes and delivers to the Company prior to the time of settlement of such transfer an agreement in writing to be bound by all the terms of this Agreement (which agreement shall include the applicable representations and warranties set forth in Section 3 hereof), or (ii) grant any proxies, deposit any of its Preferred Equity in a voting trust or enter into a voting or trading agreement with respect to the Preferred Equity. Any transfer of any shares of Preferred Equity by a Preferred Equity Holder that does not comply with the procedure set forth in the foregoing sentence shall be deemed void *ab initio*.

5

(b)     Each Noteholder individually covenants that such Party shall not, directly or indirectly, sell, pledge, hypothecate, or otherwise transfer any Notes or, as applicable, Revolving Lender Claims, except to a purchaser or other entity who executes and delivers to the Company prior to the time of settlement of such transfer an agreement in writing to be bound by all the terms of this Agreement (which agreement shall include the applicable representations and warranties set forth in Section 3 hereof). Any transfer of any Notes or Revolving Lender Claims by a Noteholder that does not comply with the procedure set forth in the foregoing sentence shall be deemed void *ab initio*.

(c)     This Agreement shall in no way be construed to preclude the Preferred Equity Holders or Noteholders from acquiring Notes or additional Notes, provided that the Parties hereto shall be given written notice by such transferee of such acquisition and any such Notes shall automatically be deemed to be subject to the terms of this Agreement.

(d)     Each Noteholder individually covenants that such Party: (i) will not exercise any rights under that certain Indenture dated as of December 23, 2009 (as amended, modified or supplemented from time to time, the "Indenture") or, to the extent applicable, under the Revolving Credit Facility, or instruct U.S. Bank National Association, as the trustee under the Indenture (including any successors, assigns or agents, the "Trustee") or, to the extent applicable, Whitebox Advisors LLC, as the Administrative Agent and Collateral Agent under the Revolving Credit Facility (including any successors, assigns or agents, the "Revolving Credit Agent") to exercise any such rights except as consistent with this Agreement and the Restructuring Term Sheet, (ii) in the event of any action by the Trustee to enforce rights and remedies triggered by a Default or an Event of Default under (and as defined in) the Indenture, will direct the Trustee to forbear from exercising such rights and remedies, and (iii) to the extent applicable, in the event of any action by the Revolving Credit Agent to enforce rights and remedies triggered by a Default or an Event of Default under (and as defined in) the Revolving Credit Facility, will direct the Revolving Credit Agent to forbear from exercising such rights and remedies.

Section 5.     Termination by the Noteholders. This Agreement may be terminated by any Noteholder, or group of Noteholders, that beneficially owns or acts as the investment advisor or manager with respect to at least a majority of the aggregate principal face amount of the Notes that are subject to the terms of this Agreement on the occurrence of any of the following events, by delivering written notice of the occurrence of such event in accordance with Section 14 below to the other Parties:

(a)     the Company fails to meet any of the milestones set forth below:[1]

---

[1] If the Majority Noteholders determine that the Company should pursue a pre-negotiated Chapter 11 Plan rather than a prepackaged Chapter 11 Plan, the milestones in this Section 5(a) shall be adjusted as follows:

(1)     the Company has not filed petitions commencing the Chapter 11 Case by January 31, 2013;

(2)     the Company has not filed the Chapter 11 Plan and the Disclosure Statement on the Chapter 11 Commencement Date;

(1)     the Company has not used its reasonable best efforts to commence the Solicitation on or before January 22, 2013, and in any event, the Solicitation is not commenced by January 31, 2013 (the "Solicitation Date");

(2)     the Company has not filed petitions commencing the Chapter 11 Case by the date that is 14 days from the Solicitation Date;

(3)     the Company has not filed the Chapter 11 Plan and the Disclosure Statement on the Chapter 11 Commencement Date;

(4)     the entry of an order (the "Interim DIP Order") approving debtor in possession financing pursuant to the terms set forth in the Restructuring Term Sheet (the "DIP Facility") on an interim basis in form and substance acceptable to the Backstop DIP Lenders (as defined in the Restructuring Term Sheet) has not occurred by the date that is 10 days after the Chapter 11 Commencement Date;

(5)     the entry of a final order approving the DIP Facility in form and substance acceptable to the Backstop DIP Lenders has not occurred by the date that is 20 days after the entry of the Interim DIP Order;

(6)     the entry of an order or orders in form and substance acceptable to the Majority Noteholders by the Bankruptcy Court confirming the Chapter 11 Plan pursuant to section 1129 of the Bankruptcy Code has not occurred by the date that is 35 days after the Chapter 11 Commencement Date;

(7)     the effective date of the Chapter 11 Plan has not occurred by the date that is 50 days after the Chapter 11 Commencement Date.

(b)     the Company files a chapter 11 plan or any exhibits, amendments, modifications or supplements thereto that are not in form or substance acceptable to the Majority Noteholders;

---

(3)     the entry of the Interim DIP Order (as defined below) has not occurred by the date that is 10 days after the Chapter 11 Commencement Date;

(4)     the entry of a final order approving the DIP Facility (as defined below) in form and substance acceptable to the Backstop DIP Lenders has not occurred by the date that is 20 days after the entry of the Interim DIP Order;

(5)     the entry of an order by the Bankruptcy Court approving the Disclosure Statement in form and substance acceptable to the Majority Noteholders has not occurred by the date that is 40 days after the Chapter 11 Commencement Date;

(6)     the entry of an order or orders in form and substance acceptable to the Majority Noteholders by the Bankruptcy Court confirming the Chapter 11 Plan pursuant to section 1129 of the Bankruptcy Code has not occurred by the date that is 75 days after the Chapter 11 Commencement Date;

(7)     the effective date of the Chapter 11 Plan has not occurred by the date that is 90 days after the Chapter 11 Commencement Date.

(c)      an order converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is entered by the Bankruptcy Court and such order is not stayed, vacated, or reversed within thirty (30) days;

(d)      the Company's exclusive right to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code shall have terminated;

(e)      entry of an order dismissing the Chapter 11 Case;

(f)      a change in the operations of the Company occurs that would have, or would reasonably be expected to have, a material adverse effect on the ability of the Company to perform its obligations under this Agreement and effect the Restructuring (a "Material Adverse Change"); provided however, that the filing of the Chapter 11 Case and the other transactions contemplated by the Restructuring Term Sheet shall not in and of itself constitute a Material Adverse Change;

(g)      any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing, or prohibiting the Restructuring on the terms set forth in the Restructuring Term Sheet in a manner that cannot be reasonably remedied in a timely manner by the Company or the Noteholders or Preferred Equity Holders, as applicable;

(h)      the Company files or publicly announces its intention to file a chapter 11 plan or any exhibit, amendment, modification or supplement to the chapter 11 plan that contains terms or conditions that are not consistent with the Restructuring or the Restructuring Term Sheet;

(i)      the Company shall have breached its obligations under this Agreement in any material respect;

(j)      the entry of an order by the Bankruptcy Court appointing an examiner with enlarged powers relating to the operation of the material part of the business of the Company, taken as a whole (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code, or the entry of an order by the Bankruptcy Court appointing a trustee under section 1104 of the Bankruptcy Code and, in either case, such order has not been stayed, reversed, or vacated within thirty (30) days after the entry of such order;

(k)      the entry of an order by the Bankruptcy Court denying confirmation of the Chapter 11 Plan or the Chapter 11 Plan is withdrawn by the Company;

(l)      any of the Preferred Equity Holders has breached its obligations under this Agreement in any material respect;

(m)      termination of this Agreement by the Preferred Equity Holders in accordance with Section 6 hereof;

(n)      the aggregate amount of all projected claims against the Company in the Chapter 11 Case, other than claims with respect to amounts owed under the Revolving Credit

8

Facility and the Notes, and other than claims for amounts typically accounted for as deferred revenue on the Company's balance sheet, reasonably determined by the Majority Noteholders to be allowed claims exceeds $85.7 million; or

(o)    the conditions set forth in the Restructuring Term Sheet as the "Certain Closing and Other Conditions to the Restructuring" have not occurred and/or have not been waived by the Majority Noteholders.

Section 6.    <u>Termination by the Preferred Equity Holders</u>.  This Agreement may be terminated by any Preferred Equity Holder or group of Preferred Equity Holders that beneficially owns at least a majority of the shares of the Preferred Equity, solely with respect to such Preferred Equity Holder or group of Preferred Equity Holders, on the occurrence of any of the following events, by delivering written notice of such event in accordance with Section 14 below to the other Parties; <u>provided</u>, <u>however</u> that any termination by a Preferred Equity Holder or group of Preferred Equity Holders pursuant to this section shall not terminate this Agreement or affect the obligations of the other Parties under this Agreement:

(a)    in the event that the Chapter 11 Plan, without the consent of the Preferred Equity Holders, provides for a treatment of the Preferred Equity Holders that is different than the Restructuring Term Sheet and such difference adversely affects in any material respect the treatment or value of the consideration provided to the Preferred Equity Holders;

(b)    Noteholders holding in excess of one third of the aggregate outstanding face amount of the Notes breach their obligations under this Agreement in any material respect;

(c)    an order converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is entered by the Bankruptcy Court and such order is not stayed, vacated, or reversed within thirty (30) days;

(d)    the Company's exclusive right to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code shall have terminated;

(e)    the entry of an order by the Bankruptcy Court appointing an examiner with enlarged powers relating to the operation of the material part of the business of the Company, taken as a whole (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code, or the entry of an order by the Bankruptcy Court appointing a trustee under section 1104 of the Bankruptcy Code and, in either case, such order has not been stayed, reversed, or vacated within sixty (30) days after the entry of such order;

(f)    the entry of an order by the Bankruptcy Court denying confirmation of the Chapter 11 Plan or the Chapter 11 Plan is withdrawn by the Company; or

(g)    in the event that prior to February 15, 2013, American Securities and Gates have not executed an agreement authorizing and approving the form of a shareholders' agreement governing the rights of holders of New Common Stock (as defined in the Restructuring Term Sheet); <u>provided</u>, <u>however</u>, that the Preferred Equity Holders, American Securities and Gates may extend such deadline by unanimous agreement; and <u>provided further</u>

9

that unless so extended or unless notice of termination shall have been given by the Preferred Equity Holder as provided herein on or prior to February 15, 2013, this right to terminate shall be null and void and of no further force and effect.

Section 7.    Termination by the Company.    In the event that (a) the Noteholders holding in excess of one third of the aggregate outstanding face amount of the Notes breach their obligations under this Agreement in any material respect, or (b) any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing, or prohibiting the Restructuring on the terms set forth in the Restructuring Term Sheet in a manner that cannot be reasonably remedied in a timely manner by the Company or the Noteholders or Preferred Equity Holders, as applicable, then the Company shall have the right to terminate this Agreement by delivering written notice of the occurrence of such event in accordance with Section 14 below to the other Parties.

Section 8.    Termination by American Securities and/or Gates.    In the event that American Securities and Gates have not jointly executed an agreement authorizing and approving the form of a shareholders' agreement governing the rights of holders of New Common Stock (as defined in the Restructuring Term Sheet) immediately prior to the earlier of (a) the launch of the Solicitation and (b) the commencement of the Chapter 11 Cases, then this Agreement may be terminated by either American Securities or Gates, in the discretion of each resepctively, by delivering written notice of the occurrence of such event in accordance with Section 14 below to the Parties.

Section 9.    Effect of Termination.

(a)    On the delivery of the written notice referred to in Sections 5, 7 or 8 in connection with the valid termination of this Agreement, the obligations of each of the Parties hereunder shall thereupon terminate and be of no further force and effect. Upon termination of this Agreement, no Party (or any other party) shall have any continuing liability or obligation to the other Parties hereunder; provided, however, that no such termination shall relieve any party from liability for its breach or non-performance of its obligations hereunder prior to such termination.

(b)    On the delivery of the written notice referred to in Section 6 in connection with the valid termination of this Agreement, the obligations hereunder of the Party that has delivered notice pursuant to Section 6 (the "Terminating Party") shall thereupon terminate and be of no further force and effect solely with respect to such Terminating Party. Upon termination of this Agreement pursuant to Section 6, no such Terminating Party shall have any continuing liability or obligation to the other Parties hereunder; provided, however, that no such termination shall relieve any party from liability for its breach or non-performance of its obligations hereunder prior to such termination.

Section 10.    Preparation of Restructuring Documents.    The Company shall instruct its counsel promptly to deliver to counsel to the each of the Noteholders and the Preferred Equity Holders for their review and comment prior to the earlier of their filing or mailing (w) the Chapter 11 Plan and Disclosure Statement, (x) the Bankruptcy Court orders to be prepared in connection therewith, (y) the Solicitation Materials, and (z) all other documents or agreements to be executed or implemented in connection therewith (collectively the, "Restructuring

10

Documents"), each of which Restructuring Documents shall be consistent in all material respects with this Agreement and the Restructuring Term Sheet and acceptable (i) to the Majority Noteholders in all respects, and (ii) to the Preferred Equity Holders in respect that the treatment of their holdings of the Preferred Equity is consistent with the Restructuring Term Sheet. The Parties further agree that this Agreement is not a financial accommodation contract that would be unenforceable under section 365(c)(2) or the Bankruptcy Code, and each agrees not to take any contrary position in the Chapter 11 Case.

Section 11.    Good Faith Negotiation of Documents.    Each Party hereby further covenants and agrees to negotiate the Restructuring Documents in good faith and, in any event, in all respects consistent with the Restructuring Term Sheet.

Section 12.    Amendments. This Agreement may not be modified, amended, or supplemented except in writing signed by the Parties.

Section 13.    Governing Law; Jurisdiction. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflict of laws of the State of New York. By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, shall be brought in federal court in the Southern District of New York. By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit, or proceeding. Notwithstanding the foregoing consent to jurisdiction, upon the commencement of the Chapter 11 Case, each of the Parties hereto hereby agrees that the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement.

Section 14.    Notices. All demands, notices, requests, consents, and communications hereunder shall be in writing and shall be deemed to have been duly given if delivered personally or by courier service, or messenger, or by facsimile or telecopy, and shall be deemed to have been duly given or made (i) upon delivery, if delivered personally or by courier service, or messenger, in each case with record of receipt, or (ii) upon transmission with confirmed delivery, if sent by facsimile or telecopy, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

If to the Company:

| | |
|---|---|
| Gary L. Pittman | William (Bill) L. Moll, Jr. |
| Geokinetics Inc. | Geokinetics Inc. |
| 1500 City West Blvd., Suite 800 | 1500 City West Blvd., Suite 800 |
| Houston, Texas 77042 | Houston, Texas 77042 |
| Telephone: (281) 848-6823 | Telephone: (281) 848-6820 |
| Facsimile: (713) 850-7330 | Facsimile: (713) 850-7330 |

with a copy to (which shall not constitute notice):

| | |
|---|---|
| Akin Gump Strauss Hauer & Feld LLP | Akin Gump Strauss Hauer & Feld LLP |
| 1700 Pacific Avenue, Suite 4100 | 1111 Louisiana Street, 44th Floor |
| Dallas, Texas 75201 | Houston, Texas 77002 |
| Attn: Sarah Link Schultz, Esq. | Attn: David P. Elder, Esq. |
| Telephone: (214) 969-2800 | Telephone: (713) 220-5800 |
| Facsimile: (214) 969-4343 | Facsimile: (713) 236-0822 |

If to the Noteholders:

| | |
|---|---|
| Larry First | Jeffrey Gates |
| American Securities Opportunities | Gates Capital Management, Inc. |
| Advisors, LLC | 1177 Avenue of the Americas |
| 299 Park Avenue | 32nd Floor |
| 34th Floor | New York, NY 10036 |
| New York, NY 10171 | |

with a copy to (which shall not constitute notice):

Brad Eric Scheler, Esq.
Jennifer Rodburg, Esq.
Fried, Frank, Harris, Shriver & Jacobson
LLP
One New York Plaza
New York, NY 10004-1980
Telephone: (212) 859-8520
Facsimile: (212) 859-4000

If to the Preferred Equity Holders:

Avista Capital Holdings, L.P.
65 East 55th Street, 18th Floor
New York, N.Y.
Attn: General Counsel
Telephone: (212) 593-6900
Facsimile: (212) 593-6901

and

Avista Capital Holdings, L.P.
1000 Louisiana
Houston, TX 77002
Attn: Jeff Gunst
Telephone: (212) 328-1099
Facsimile: (212) 328-1097

with a copy to (which shall not constitute notice):

Steven D. Rubin, Esq.
Gardere Wynne Sewell LLP
Wells Fargo Plaza, Suite 3400
1000 Louisiana
Houston, TX 77002
Telephone: 713-276-5202
Facsimile: 713-276-6202

Section 15.    Entire Agreement. This Agreement constitutes the full and entire understanding and agreement among the Parties with regard to the subject matter hereof, and supersedes all prior negotiations and agreements with respect to the subject matter hereof.

Section 16.    Headings. The headings of the paragraphs and subparagraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

Section 17.    Successors and Assigns. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns; provided, however, that nothing contained in this paragraph shall be deemed to permit sales, assignments, or transfers other than in accordance with Section 4.

Section 18.    Specific Performance. Each Party hereto recognizes and acknowledges that a breach by it of any covenants or agreements contained in this Agreement may cause other parties to sustain damages for which such parties would not have an adequate remedy at law for money damages, and therefore each Party hereto agrees that in the event of any such breach, such other parties shall be entitled to seek the remedy of specific performance of such covenants and agreements and injunctive and other equitable relief in addition to any other remedy to which such parties may be entitled, at law or in equity.

13

Section 19.    Several Not Joint Obligations. The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

Section 20.    Remedies Cumulative. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such party.

Section 21.    No Waiver. The failure of any Party hereto to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such compliance. Moreover, each of the Parties expressly acknowledges and agrees that, except as expressly provided in this Agreement, nothing in this Agreement is intended to, or does, in any manner waive, limit, impair or restrict the ability of any party to this Agreement to protect and preserve all of its rights, remedies and interests, including, without limitation, with respect to its claims against and interests in the Company.

Section 22.    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement. Delivery of an executed signature page of this Agreement by telecopier or email shall be as effective as delivery of a manually executed signature page of this Agreement.

Section 23.    Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 24.    Effectiveness of this Agreement.  The effectiveness of this Agreement, and the respective obligations of the Parties under this Agreement, are conditioned upon the receipt of the consent and signature hereto of each of the Parties.

Section 25.    No Third-Party Beneficiaries. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

Section 26.    Additional Parties. Without in any way limiting the provisions hereof, additional holders of Notes may elect to become Parties by executing and delivering to the Company a counterpart hereof. Such additional holder shall become a Party to this Agreement as a Noteholder in accordance with the terms of this Agreement as if such additional holder were an original named party hereto.

Section 27.    No Solicitation. This Agreement is not intended to be, and each signatory to this Agreement acknowledges that this Agreement is not, a solicitation to the acceptance or rejection of a plan of reorganization for the Company. Acceptance of the Restructuring will not

14

be solicited from any holder of Notes until it has received the disclosures required under or otherwise in compliance with applicable law.

Section 28.    Settlement Discussions. This Agreement and the Restructuring are part of a proposed settlement of a dispute among the Parties. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

Section 29.    Consideration. It is hereby acknowledged by the Parties hereto that, other than the agreements, covenants, representations, and warranties set forth herein and in the Restructuring Term Sheet and the Indenture, no consideration shall be due or paid to the Parties for their agreement to support and vote to accept the Chapter 11 Plan in accordance with the terms and conditions of this Agreement.

Section 30.    Receipt of Adequate Information; Representation by Counsel. Each Party acknowledges that it has received adequate information to enter into this Agreement and that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any party with a defense to the enforcement of the terms of this Agreement against such party shall have no application and is expressly waived. The provisions of the Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties.

Section 31.    Mutual Assurances. Each Party hereby covenants to the other Parties to use its reasonable best efforts, as expeditiously as possible, to perform its respective obligations under this Agreement and take such actions as may be reasonably necessary under this Agreement to consummate the Restructuring. The Parties further agree to take such other actions as are reasonably necessary and appropriate to carry out the foregoing and to effectuate the Restructuring and evidence the Parties' support of the Chapter 11 Plan and commitment to vote in favor of the Chapter 11 Plan including, without limitation, the execution and delivery of any transmittal letters, written consents, or other similar documents  containing customary terms and provisions, for distribution to the holders of any impaired claims against or interests in the Company.

Signature Pages Follow

15

IN WITNESS WHEREOF, the Parties hereto have duly executed and delivered this Agreement as of the date first above written.

Dated: January ___, 2013

Geokinetics Inc.

By: _____
Name:
Its:

Geokinetics USA, Inc.

By: _____
Name:
Its:

Geokinetics Holdings USA, Inc.

By: _____
Name:
Its:

Geokinetics International Holdings, Inc.

By: _____
Name:
Its:

Geokinetics Services Corp.

By: _____
Name:
Its:

Geokinetics Management, Inc.

By: _____
Name:
Its:

Geokinetics Processing, Inc.

By: _____
Name:
Its:

Geokinetics International, Inc.

By: _____
Name:
Its:

Geokinetics Acquisition Company

By: _____
Name:
Its:

Advanced Seismic Technology, Inc.

By: _____
Name:
Its:

16

Dated:  January ___, 2013                    **[*Party*]**

 

_____
Name:_____
Title: _____

Telephone: _____
Facsimile: _____

Aggregate principal amount
of Revolving Lender Claims:


$_____

Aggregate principal amount of Noteholder
Claims:


$_____

Aggregate number of Preferred Equity
Interests:


$_____

Any other claims or interests against the
Company:


_____

EXHIBIT A

RESTRUCTURING TERM SHEET

8842092.25

## GEOKINETICS INC.
### SUMMARY OF PRINCIPAL TERMS AND CONDITIONS OF RESTRUCTURING

This term sheet (the "Restructuring Term Sheet") outlines certain of the principal economic terms of a proposed restructuring (the "Restructuring Transaction") of the outstanding indebtedness of, and equity interests in, Geokinetics, Inc. and its direct and indirect domestic affiliates and subsidiaries (collectively, the "Company"). The proposed terms and conditions set forth in this Restructuring Term Sheet are intended as an outline of certain material terms of the Restructuring Transaction. This Restructuring Term Sheet does not include descriptions of all terms, conditions and other provisions that would be contained in definitive documentation related to a financial restructuring and is not intended to limit the scope of discussion or negotiation of any matters not inconsistent with the specific matters set forth herein. The transactions contemplated by this Restructuring Term Sheet will be subject to the terms and conditions to be set forth in definitive documents at a later date.

This Restructuring Term Sheet does not constitute an offer of securities or a solicitation of the acceptance or rejection of any restructuring or similar plan.

The Restructuring Transaction is intended to be effectuated through either a pre-packaged or pre-negotiated in-court restructuring and chapter 11 plan of reorganization described below.

**This Restructuring Term Sheet is strictly confidential and may not be shared with any person.**

| I.    GENERAL | |
|---|---|
| Company | Geokinetics Inc.; Geokinetics Holdings USA, Inc.; Geokinetics Services Corp.; Geokinetics Processing, Inc.; Geokinetics Acquisition Company; Geokinetics USA, Inc.; Geokinetics International Holdings, Inc.; Geokinetics Management, Inc.; Geokinetics International, Inc.; and Advanced Seismic Technology, Inc. The entities listed herein as the "Company" are based on the understanding that they include Geokinetics, Inc. and all of its direct and indirect domestic affiliates and subsidiaries. |
| Revolving Lenders | Lenders (collectively, "Revolving Lenders") under the $50 million revolving credit facility (the "Revolving Credit Facility") pursuant to that certain Amended and Restated Credit Agreement, dated as of August 12, 2011, and as amended from time to time, among the Company and the various financial entities signatory thereto. |
| Noteholders | Holders (collectively, "Noteholders") of $300 million in principal amount of 9.75% senior secured notes (the "Senior Secured Notes") due December 2014. The holders of 50.1% or more in aggregate principal amount of the Senior Secured Notes shall be referred to herein as the "Majority Noteholders". |
| Preferred Equity Holders | Holders (collectively, "Preferred Equity Holders") of approximately $144 million in preferred equity interests in Geokinetics Inc. comprised of Series B-1 Senior Convertible Preferred Stock and Series C-1 Senior Preferred Stock (collectively, the "Preferred Equity Interests"). |

| | |
|---|---|
| **Restructuring Transaction** | Subject to the terms hereof, the Company shall file for chapter 11 relief in the District of Delaware (the "Bankruptcy Court") and restructure its capital structure (the "Restructuring") through a pre-packaged or pre-negotiated restructuring plan (the "Plan") as determined by the Majority Noteholders. The Plan shall be consistent with the terms of this Restructuring Term Sheet and satisfactory in form and substance to the Majority Noteholders. The Majority Noteholders shall determine whether the Plan will be implemented through a pre-packaged chapter 11 case or a pre-negotiated chapter 11 case provided that regardless of such determination, the Company shall file the Plan and related disclosure statement and a bar date motion with the Bankruptcy Court on the same day the Company files its bankruptcy petitions (the "Petition Date"). In light of the treatment of unsecured creditors provided herein and the execution of the Restructuring Support Agreement, the Company shall request that an official committee of unsecured creditors not be appointed in Company's chapter 11 case. |
| **Plan Support** | The Majority Noteholders, and Avista Capital Partners, L.P. and Avista Capital Partners (Offshore), L.P., holders of over two thirds of the Preferred Equity Interests, will enter into a plan support agreement (the "PSA") with the Company wherein they will commit to support the Restructuring and the Plan. This Restructuring Term Sheet will be an exhibit to the PSA and will be incorporated into the PSA in all respects. |
| **II.        FINANCING** | |
| **Debtor In Possession Financing** | Up to $25 million of debtor in possession financing ("DIP Facility"), subject to a budget approved by the Backstop DIP Lenders (as defined and provided in Exhibit 1), shall be provided by Noteholders. The opportunity to participate in the DIP Facility will be given to all Noteholders on a pro rata basis based on their holdings of the Senior Secured Notes. American Securities Opportunities Advisors, LLC and Gates Capital Management, Inc. will backstop the entire amount of the DIP Facility based on their pro rata holdings of the Senior Secured Notes vis-à-vis each other. <br><br> The DIP Facility will be secured by liens junior to the Revolving Credit Facility and senior to all other liens, including, without limitation, the liens securing the Senior Secured Notes. <br><br> Pursuant to the Plan, on the effective date of the Plan (the "Effective Date"), all outstanding amounts under the DIP Facility shall be converted into newly issued shares of common stock of reorganized Geokinetics Inc. (the "New Common Stock") at a 20% discount to Plan value (the "DIP Equity Distribution") with such Plan value as agreed to by the Majority Noteholders and the Company. <br><br> A summary of the principal terms and conditions of the DIP Facility is set forth in the debtor in possession financing term sheet (the "DIP Term Sheet") attached hereto as Exhibit 1. |

| Exit Facility | The reorganized Company will obtain exit financing (the "Exit Facility") in an amount and on terms to be determined by the Majority Noteholders, to fund the cash requirements of the Plan, including without limitation, repayment of the $50 million outstanding under the Revolving Credit Facility plus accrued interest, and the post-confirmation operations of the Company's business. |
|---|---|

| III. | TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN |
|---|---|
| Administrative Expense Claims | All administrative expense claims will be paid in full, in cash, on the Effective Date; provided that, (i) administrative expense claims incurred in the ordinary course will be paid in accordance with their terms and (ii) fees and expenses of professionals retained under section 327 or 1103 of the Bankruptcy Code will be paid in accordance with the procedures established by the Bankruptcy Court. |
| Priority Tax Claims | All priority tax claims will be paid in full, in cash, on the Effective Date or treated in an alternative manner consistent with the Bankruptcy Code and determined by the Majority Noteholders. |
| Unsecured Priority Claims | All unsecured priority claims will be paid in full, in cash, on the Effective Date or treated in an alternative manner consistent with the Bankruptcy Code and determined by the Majority Noteholders. |
| DIP Facility | On the Effective Date, all outstanding amounts under the DIP Facility shall be converted into New Common Stock at a 20% discount to Plan value with such Plan value determined as set forth above. |
| Revolving Credit Facility | On the Effective Date, the $50 million in outstanding revolving loans plus any accrued interest[1] shall be satisfied in full with proceeds of the Exit Facility, or will be afforded such other treatment as agreed by the Revolving Lenders and the Majority Noteholders. |
| Senior Secured Notes | On the Effective Date, in exchange for their Senior Secured Notes, Noteholders shall receive their pro rata share of 100% of the New Common Stock (subject to dilution from the Management Incentive Plan (as detailed below) and the DIP Equity Distribution). |
| Preferred Equity Interests | On the Effective Date, in exchange for their Preferred Equity Interests, Preferred Equity Holders shall receive their pro rata share of a $6 million cash distribution. |
| Series D Preferred Stock | Holders of Series D Preferred Stock shall receive no distribution and their Series D Preferred Stock shall be canceled under the Plan. |
| Common Equity Interests | Holders of common stock shall receive no distribution and their equity interests shall be canceled under the Plan. |

---

[1] Interest shall accrue at the non-default contract rate.

3

| Trade Claims and Other Unsecured Claims | The Company represents that trade and other unsecured claims scheduled by the Company in its bankruptcy schedules will not exceed $46 million in the aggregate and that claims of governmental units will not exceed $40 million in the aggregate. Based on these representations, unless otherwise determined by the Majority Noteholders, all trade claims and other unsecured debt shall be paid in the ordinary course of business. |
|---|---|
| Releases and Exculpation | Management, the Board of Directors, the Revolving Lenders (and Agents under the Revolving Credit Facility), the Noteholders and the Preferred Equity Holders will receive mutual releases and exculpation (from each other and from the Company) on customary terms. D&O coverage will continue without any lapses for new, continuing and departing directors and officers. |

| IV. | CORPORATE GOVERNANCE AND MANAGEMENT |
|---|---|
| Board of Directors | Board of Directors (the "New Board") to be determined by the Majority Noteholders. The identities and affiliations of the members of the New Board will be disclosed to the Bankruptcy Court as required by the Bankruptcy Code. |
| Management | The senior management team of the reorganized Company will enter into new employment agreements that shall be satisfactory to the Majority Noteholders. |
| Management Incentive Plan | On or as soon as reasonably practicable after the Effective Date, a management incentive program (the "Management Incentive Program") shall be adopted by the New Board to provide designated members of senior management of the Company with shares of, units representing shares of or the value of a share of, and/or options to purchase shares of, up to 10% of the New Common Stock. The Management Incentive Program shall contain performance based and/or time-vesting grants and the specific identities of recipients, amounts and timing of grants and other terms and conditions will be determined by the New Board. |
| Shareholders Agreement | It shall be a condition to the Restructuring and the Majority Noteholders' support of the Restructuring that prior to the earlier of the solicitation of votes to accept or reject the Plan or the commencement of the chapter 11 cases, American Securities Opportunities Advisors, LLC and Gates Capital Management, Inc. shall have reached mutual agreement as to the terms of a shareholders' agreement for holders of New Common Stock. |

4

| Terms for Reorganized Company and New Common Stock | The New Common Stock will be issued pursuant to one or more exemptions from registration under federal and state securities laws and will: (i) not be registered and (ii) be transferable by the recipients thereof only under an effective registration statement or pursuant to an exemption from registration, including, without limitation, section 1145 of the Bankruptcy Code. The Plan shall provide that the New Common Stock is being issued pursuant to section 1145 of the Bankruptcy Code. The reorganized Company will initially be a private company. |
|---|---|
| | The organizational structure of the reorganized Company shall be structured in the most tax efficient manner as determined by the Majority Noteholders (and the terms of the Plan shall be revised to the extent necessary to be consistent with any such structure). |
| Professional Fees and Expenses | All of the Majority Noteholders' professional fees and out-of-pocket expenses incurred in connection with the Restructuring or any other matter in connection thereto, including, without limitation, those fees and expenses incurred during the Company's chapter 11 cases, shall be paid by the Company on a current basis and prior to and as a condition to the Effective Date without need for a fee application or court approval. |
| | Up to $75,000 in the aggregate of Avista Capital Partners, L.P. and Avista Capital Partners (Offshore), L.P.'s professional fees and out-of-pocket expenses incurred in connection with the Restructuring or any other matter in connection thereto, including without limitation, those fees and expenses incurred during the Company's chapter 11 cases, shall be paid by the Company on a current basis and prior to and as a condition to the Effective Date without need for a fee application or court approval. |
| Corporate Governance Documents | Corporate governance terms to be determined by the Majority Noteholders in consultation with the Company. |
| V.          OTHER TERMS | |
| Governing Law | New York |

| Certain Closing and Other Conditions to the Restructuring | The Restructuring shall be subject to usual and customary and necessary conditions for a transaction of this type, as well as other conditions satisfactory to the Majority Noteholders, including, without limitation: |
|---|---|
| | • The terms, conditions and circumstances of any and all documents relating to the Restructuring and the Company shall be acceptable to the Majority Noteholders in all respects and will have been reviewed and expressly approved by the Majority Noteholders. |
| | • All of the Majority Noteholders' professional fees and out-of-pocket expenses incurred in connection with the Restructuring or any other matter in connection thereto, including, without limitation, those fees and expenses incurred during the Company's chapter 11 cases, shall have been paid by the Company as a condition to the Effective Date. |
| | • The Company shall have provided the Majority Noteholders with full and complete access to the Company and its management. |
| | • The Restructuring transactions shall be structured in the most tax efficient manner as determined by the Majority Noteholders, and all accounting treatment and other tax matters shall be resolved to the satisfaction of the Majority Noteholders. |
| | • All requisite governmental or regulatory approvals for the Restructuring shall have been obtained and no governmental or regulatory authority shall have taken any action that could reasonably be expected to have a material adverse effect on the consummation (including, without limitation, timing) of the Restructuring. |
| | • There is no material adverse change to the assets, liabilities, businesses or prospects of the Company which occurs or is discovered after the date of execution of the PSA. |
| | • The amount of all projected claims against the Company, including, without limitation, all trade and other unsecured claims, but excluding claims for amounts owed under the Revolving Credit Facility and the Notes, and excluding claims for amounts typically accounted for as deferred revenue on the Company's balance sheet, reasonably determined by the Majority Noteholders to be allowed claims shall not exceed $85.7 million in the aggregate. |

**EXHIBIT 1**

DEBTOR-IN-POSSESSION FACILITY

Summary of Principal Terms and Conditions

────────────────────

This Summary of Principal Terms and Conditions outlines certain key terms of a proposed Debtor-in-Possession Facility by and among the Loan Parties, the DIP Agent and the DIP Lenders, each as described below (the "DIP Facility"). This term sheet (the "DIP Term Sheet") is not binding on any party and does not contain all of the terms, conditions and other provisions of the transactions contemplated hereby. As such, the terms and conditions set forth in this DIP Term Sheet are to be used solely as a basis for continued discussions and do not constitute a commitment to provide a financing commitment of any sort or to prepare, negotiate, execute or deliver such a commitment. The DIP Term Sheet is in the nature of a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any other rule of similar import. All figures, terms, and conditions are subject to change or withdrawal at any time. This DIP Term Sheet is confidential and is subject to the execution of definitive documents acceptable to the parties in their sole discretion.

## I. PARTIES

| | |
|---|---|
| Debtor/Loan Parties: | Geokinetics Holdings USA, Inc. and its domestic direct and indirect subsidiaries, as debtors and debtors-in-possession in a case under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. commenced in the District of Delaware (such case, the "Case"). Geokinetics Holdings USA, Inc. shall be the "Borrower" and Geokinetics Inc. (the "Parent") and each of its direct and indirect domestic subsidiaries (other than the Borrower) shall be "Guarantors" of the DIP Obligations (the Borrower and Guarantors, collectively, the "Loan Parties"). |
| DIP Agent: | [        ]² |
| DIP Lenders: | The Backstop DIP Lenders (as defined below) to provide (i) during the Interim Period (as defined below), the Interim Availability (as defined below) of Term Loans subject to the Approved Budget (as defined below) and (ii) upon entry of the Final DIP Order (as defined below), the Final Availability (as defined below) of the Term Loans subject to the Approved Budget; provided that each beneficial holder of the 9.75% Senior Secured Notes Due 2014 (the "Senior Notes") [that is an accredited investor] will have an opportunity prior to entry of the Final DIP Order to elect to be a lender under the DIP Facility and to fund a portion of the aggregate Term Loans under the DIP Facility based on such holder's pro rata share of the principal amount of the Senior Notes held by such holder (such electing holders, together with the Backstop DIP Lenders, the "DIP Lenders"). |
| Backstop DIP Lenders: | American Securities Opportunities Advisors, LLC ("Am Sec") and Gates Capital Management, Inc. ("GCM" and together with Am Sec, the "Backstop DIP Lenders") shall backstop the entire DIP Facility (including (i) as to elections of other DIP Lenders to become DIP Lenders and (ii) as to any defaulting DIP Lender that fails to fund its portion of the DIP Facility) based on their pro rata holding of Senior |

───────────────────────

² DIP Agent to be determined by the Majority Noteholders.

Notes *vis-a-vis* each other.

## II.  DIP FACILITY[3]

Type and Amount:

A superpriority debtor-in-possession term loan facility in an aggregate principal amount of up to $25,000,000 (the "Term Loan" and together with all other obligations under the DIP Facility, the "DIP Obligations"), subject to the Approved Budget (as defined below) and other limitations set forth below, secured by liens junior to the Revolving Credit Facility (as defined below) and senior to all other liens, including, without limitation, the liens securing the Senior Notes (as defined below).

DIP Closing Date:

Closing to occur upon satisfaction (or waiver by the Backstop DIP Lenders in their sole discretion) of the conditions under "Closing Conditions" below.

DIP Maturity Date:

The date that is the earlier to occur of: (a) four (4) months after the DIP Closing Date; (b) the date the DIP Obligations are accelerated pursuant to the terms of the DIP Documentation (defined below), whether at stated maturity, upon an Event of Default or otherwise; and (c) the effective date of the Loan Parties' confirmed chapter 11 plan.

Availability:

Up to $25,000,000 of the Term Loan shall be available to the Borrower during the term of the DIP Facility subject to terms and conditions set forth in the DIP Documentation and the Approved Budget (as defined below); provided that: (a) after entry of the Interim Order, in form and substance satisfactory to the Backstop DIP Lenders, but prior to the entry of the Final DIP Order, the Borrower shall only be permitted to request and receive an amount not to exceed, as of any date of determination, the lesser of (i) $15,000,000 and (ii) the amount authorized by the Bankruptcy Court pursuant to the Interim DIP Order ("Interim Availability") to be funded by the Backstop DIP Lenders);[4] (b) upon entry of the Final DIP Order approving the Adequate Protection (as defined below) and otherwise in form and substance satisfactory to the Backstop DIP Lenders, subject to the terms and conditions of the DIP Documentation, the Borrower shall only be permitted to request and receive an amount not to exceed, as of any date of determination, $25,000,000 *minus* the aggregate amount borrowed during the Interim Period ("Final Availability")[5] to be funded by the Backstop DIP Lenders (or, to the extent funded pursuant to the election of other Senior Noteholders, the other DIP Lenders); and (c) each borrowing shall be requested and made in accordance with the Approved Budget (as defined below) and subject to the satisfaction of the conditions precedent in the DIP Documentation.  For the avoidance of doubt, (x) if the Final DIP Order does not approve the Adequate Protection or the Final DIP Order is not otherwise in form and

---

[3] In the event the Majority Noteholders determine to proceed with a pre-packaged chapter 11 filing, the type and amount, maturity date and availability, as well as other applicable terms will be modified to address the shorter duration of the Case.

[4] The "Interim DIP Order" means any order entered by the Bankruptcy Court in the Case approving the DIP Facility on an interim basis.

[5] The "Interim Period" means the period from the DIP Closing Date through entry of the order by the Bankruptcy Court in the Case approving the DIP Facility on a final non-appealable basis (the "Final DIP Order").

2

substance satisfactory to the Backstop DIP Lenders, the DIP Lenders shall have no commitment to make any additional loans and all availability under the DIP Facility shall be eliminated and (y) the Backstop DIP Lenders shall not be required to make any Loans in excess of the Interim Availability (during the Interim Period) or the Final Availability (after the Interim Period) for any reason, including, without limitation, to pay the fees and expenses of estate-retained professionals.

Purpose:

Upon entry of the Interim DIP Order, the proceeds of the Term Loan shall be used to fund the working capital needs and general corporate purposes of the Borrower (including, without limitation, costs related to the Case) and for such other purposes as agreed by the Borrower and Backstop DIP Lenders. Use of the proceeds of the Term Loan pursuant to this paragraph each shall be subject to availability pursuant to the preceding section entitled "Availability". None of the proceeds may be used to challenge, as opposed to investigate, the validity, perfection, priority, extent or enforceability of the Senior Notes, or the liens or security interests securing the obligations under the Senior Notes or to pursue any causes of action of any kind against the Collateral Trustee and/or the Indenture Trustee for the Senior Notes, or the holders of the Senior Notes (the "Senior Noteholders"). To the extent an official committee of unsecured creditors is appointed in the Case, no more than $25,000 of any proceeds or cash collateral shall be used by counsel to the official committee, if any, to investigate, but not prosecute, the validity, perfection, priority, extent or enforceability of the Senior Notes or the liens or security interests securing the obligations under the Senior Notes. The Loan Parties shall waive the right to investigate and challenge the validity, perfection, priority, extent or enforceability of the Senior Notes (and the liens and claims granted thereunder) and shall waive any and all claims of any kind against the Collateral Trustee, the Indenture Trustee and Senior Noteholders (subject to the rights of the official committee, if any, to commence any action against the Collateral Trustee, the Indenture Trustee and/or the Senior Noteholders within 15 days of the committee's appointment). Notwithstanding anything herein, the Loan Parties shall not be entitled to use the proceeds of the Term Loan in any way or for any purpose other than as explicitly set forth in the Approved Budget and the DIP Documentation.

## III. CERTAIN ECONOMIC TERMS

Interest Rate:

The outstanding DIP Obligations shall bear interest at a rate equal to 9.25% per annum and shall be paid in cash on the last business day of each month.

DIP Agent Fees:

$[___].[6]

Transaction Fees:

None.

## IV. COLLATERAL

---

[6] Fees of DIP Agent will depend on the DIP Agent selected by the Backstop DIP Lenders.

Collateral:

The DIP Lenders shall be granted pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests (the "DIP Liens"), which are junior to the security interests securing the revolving loans pursuant to the Amended and Restated Credit Agreement dated as of August 12, 2011 by and among the Borrower, Parent, Administrative Agent and Collateral Agent and the lenders party thereto from time to time (collectively, the "Revolving Lenders") (the "Revolving Credit Facility"), and senior and superior in priority to all other secured and unsecured creditors of the Loan Parties' estate, upon and to be upon all real and personal property[7] of the Loan Parties now owned or hereafter acquired and all other property of whatever kind and nature (whether pre or post petition), in each case, that is pledged as collateral or is otherwise subject to a lien or security interest under any security document constituting part of the DIP Documentation (as defined below) or any order of the Bankruptcy Court in the Case relating to working capital needs and general corporate purposes of the Borrower (including, without limitation, costs related to the Case) (collectively, the "Collateral"), including, without limitation, the Interim DIP Order and/or Final DIP Order (each such financing order is individually and collectively, a "DIP Order"); provided, however, all liens and security interests securing the DIP Obligations shall be subject to: (a) so long as no Event of Default has occurred, allowed professional fees and expenses in the Case incurred prior to the occurrence of an Event of Default, subject to entry of a customary order of the Bankruptcy Court;[8] (b) following an Event of Default, allowed professional fees and expenses in the Case, which expenses and fees were incurred solely following such Event of Default, in an aggregate amount not to exceed $2,500,000; and (c) United States Trustee's fees pursuant to 28 U.S.C. 1930(a)(6) and 31 U.S.C. 3717 (the fees and expenses described in this paragraph, collectively, the "Carve-Out"); and provided, further, however, any liens and security interests in Avoidance Actions shall be granted only pursuant to the Final DIP Order and shall not be granted pursuant to any Interim DIP Order.   As used herein, the term "Avoidance Actions" means any and all claims or causes of action arising under Chapter 5 (other than Section 506(c) or Section 724(a)) of the Bankruptcy Code to avoid transfers, preserve or transfer liens or otherwise recover property of the estate and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise.  "Avoidance Actions" do not include claims or causes of action pursuant to Section 549 of the Bankruptcy Code and the proceeds thereof, to the extent the transfer avoided was of an asset otherwise constituting Collateral securing the Senior Notes on the Petition Date.

For the avoidance of doubt, liens and security interests granted pursuant to Bankruptcy Code section 364(d) shall mean any liens or security

---

[7] Personal property includes cash, deposit accounts, negotiable instruments and other cash equivalents.  Personal property also includes Avoidance Actions (as defined below).

[8] For the avoidance of doubt, fees and expenses incurred prior to an Event of Default by a court-approved professional, regardless of whether an order has been entered approving such fees and expenses shall be included in this section " (a) ", but no fees or expenses shall be paid unless and until such time as an order is entered approving such fees and expenses.

interests subordinate and junior to the liens and security interests securing the loans and other obligations under the Revolving Credit Facility in existence and equal or senior in priority to valid and enforceable liens and security interests in existence on Petition Date in the Collateral that are perfected and unavoidable on the Petition Date (or perfected after the Petition Date pursuant to Bankruptcy Code section 546(b)).

For the avoidance of doubt, subject to (a) the Carve-Out, and (b) as to the Avoidance Actions, upon entry of the Final DIP Order, the Collateral includes all of the assets of the Loan Parties existing on the date of the filing by Loan Parties of the petition(s) with respect to the Case (the "Petition Date") and all of the assets of Loan Parties arising or acquired after the Petition Date, including, without limitation, Avoidance Actions.

Subject to the Carve-Out, all DIP Obligations will constitute allowed super-priority administrative expense claims in the Case having priority over all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code (other than any administrative expenses claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code to extent provided to Revolving Lenders and Agents  under the Revolving Credit Facility, in which case, such claims of the Revolving Lenders and Agents shall have priority over all of such claims owned by the DIP Agent and DIP Lenders).

Except for the DIP Orders, no filing with any governmental authority, delivery of possessory collateral, establishment of "control" or other action shall be required with respect to perfection of the DIP Liens; and no endorsement of any insurance policies to include a lender's loss payable clause, or to name the DIP Agent as additional insured, shall be required in respect of the DIP Facility; provided that Company shall make such filings and take such other actions as the Backstop DIP Lenders may reasonably request, subject to the cooperation of the Collateral Trustee, if required.

## V.  ADEQUATE PROTECTION

| | |
|---|---|
| Adequate Protection (Senior Notes): | Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, the Collateral Trustee (insofar as acting on behalf of the Indenture Trustee and the Senior Noteholders), the Indenture Trustee for the Senior Notes, and the Senior Noteholders shall be granted the following as adequate protection (collectively, the "Adequate Protection") of their respective prepetition security interests and in connection with the use of cash collateral, the consensual priming specified herein and any diminution in the value of collateral securing the Senior Notes and the pre-petition security interests of the Collateral Trustee (insofar as acting on behalf of the Indenture Trustee and the Senior Noteholders), Indenture Trustee and Senior Noteholders, whether or not such diminution in value results from the sale, lease or use by the Loan Parties of the collateral securing the Senior Notes, including, without limitation, cash collateral or the stay of enforcement of any pre-petition security interest arising from section 362 of the Bankruptcy Code, or otherwise: |

(a) Note Adequate Protection Lien. Without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, a security interest in and lien on the Collateral (the "Note Adequate Protection Liens"), subject and subordinate only to (x) the liens securing the Revolving Credit Facility, (y) the Carve-Out and (z) the liens securing the DIP Facility.

(b) Super-Priority Claim. Subject to the payment of the Carve-Out, a superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the claims under section 364(c)(1) of the Bankruptcy Code held by the DIP Agent and the DIP Lenders under the DIP Facility, provided that the Indenture Trustee and the Senior Noteholders shall not receive or retain any payments, property or other amounts in respect of the superpriority claims under section 507(b) of the Bankruptcy Code granted hereunder unless and until the obligations under the DIP Facility and Revolving Credit Facility have indefeasibly been paid in cash in full.

(c) Professional Fees and Expenses. Payment of the costs and expenses of the Indenture Trustee for the Senior Notes, and the Backstop DIP Lenders, including, without limitation, the professional fees and expenses of Fried, Frank, Harris, Shriver and Jacobson LLP. No fee application or court approval shall be required and payment upon delivery of an invoice shall be sufficient. These fees and expenses shall be paid on a current basis during the Case and, to the extent not so paid, shall be a condition to the effective date of any chapter 11 plan.

(d) Waiver of Claims. The Loan Parties shall acknowledge the Borrower's indebtedness under the Senior Notes and shall waive all claims it may have against the Indenture Trustee and Senior Noteholders under the Senior Notes.

| Adequate Protection (Revolving Credit Facility): | Pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Agents and Revolving Lenders under the Revolving Credit Facility shall be granted the following as adequate protection (collectively, the "Revolver Adequate Protection"; together with Note Adequate Protection, the "Adequate Protection") of their respective prepetition security interests and in connection with the use of cash collateral, and any diminution in the value of collateral securing the Revolving Credit Facility and the pre-petition security interests of the Agents and the Revolving Lenders under the Revolving Credit Facility, whether or not such diminution in value results from the sale, lease or use by the Loan Parties of the collateral securing the Revolving Credit Facility, including, without limitation, cash collateral or the stay of enforcement of any pre-petition security interest arising from section 362 of the Bankruptcy Code, or otherwise: |

(a) Adequate Protection Lien. Without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, a security interest in and lien on the Collateral (the "Revolver Adequate Protection Liens"), subject and subordinate only to the Carve-Out.

(b) Super-Priority Claim. Subject to the payment of the Carve-Out, a superpriority administrative expense claim as provided for in section

507(b) of the Bankruptcy Code, senior to the claims under section 364(c)(1) of the Bankruptcy Code held by the DIP Agent and the DIP Lenders under the DIP Facility and held by the Indenture Trustee and Noteholders and senior to the superpriority administrative expense claims under section 507(b) of the Bankruptcy Code provided to Indenture Trustee and Noteholders.

(c) Professional Fees and Expenses. Payment of the reasonable fees and expenses of the attorneys for the Agents and Revolving Lenders under the Credit Facility. No fee application or court approval shall be required and payment upon delivery of an invoice shall be sufficient.

## VI.  CERTAIN CONDITIONS

Closing Conditions:

The DIP Facility shall be conditioned upon the satisfaction of conditions precedent usual and customary for facilities and transactions of this type as agreed to by the Loan Parties and the Backstop DIP Lenders. In addition, the following conditions shall also be satisfied as a condition to the effectiveness of the DIP Facility and the DIP Lenders' commitment to make DIP Loans during the Interim Period:

Each Loan Party shall have executed and delivered satisfactory to the Backstop DIP Lenders definitive financing documentation for the DIP Facility (the "DIP Documentation"). Also, such DIP Documentation shall confirm that all representations and warranties in the DIP Documentation are accurate in all material respects.

The DIP Agent and the Backstop DIP Lenders shall have received (i) a detailed 2013 budget with back-up and schedules and (ii) an initial thirteen-week cash flow forecast for the period beginning with the week which includes the Petition Date through the thirteenth week thereafter, in each case in form and substance satisfactory to the Backstop DIP Lenders (the "Initial Approved Budget").[9] The Borrower shall not pay current interest on the Revolving Credit Facility or the Senior Notes during the Case and the Approved Budget shall so reflect this. All interest earned under the Revolving Credit Facility and the Senior Notes shall accrue during the Case and shall be added to the pre-petition claim amount of the holders thereof to be satisfied in accordance with the Plan (as defined below).

The Interim DIP Order shall have authorized (i) the Borrower to pay to the Backstop DIP Lenders (as applicable) from proceeds of the DIP Facility or from other funds at closing all actual expenses required to be paid for which invoices have been presented on or before the DIP Closing Date including, without limitation, the fees and expenses of Fried, Frank, Harris, Shriver & Jacobson LLP and (ii) the DIP Loans to be made during the Interim Period consistent with the provisions hereof.

---

[9] For the avoidance of doubt, estate-retained professionals will estimate their anticipated fees and expenses to be included within the Initial Approved Budget; however, the fees and expenses of estate-retained professionals, and the incurrence of Term Loans for the payment thereof, shall not be subject to the Initial Approved Budget or any other Approved Budget (as defined below).

7

All approvals necessary in connection with the financing contemplated hereby and the continuing operations of the Loan Parties shall have been obtained on terms satisfactory to the Backstop DIP Lenders and shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose adverse conditions on the DIP Facility or the transactions contemplated hereby.

The Backstop DIP Lenders shall have received title reports and UCC lien and intellectual property related search results with respect to the Collateral indicating no material liens other than the Priority Liens subject to the Collateral Trust and Intercreditor Agreement, dated as of December 23, 2009 (the "Collateral Trust and Intercreditor Agreement"), among Borrower, the guarantors from time to time party thereto, the Priority Debt Representatives (as defined therein) and U.S. Bank National Association, as collateral trustee.

The Borrower shall have provided the Backstop DIP Lenders a copy of all motions to be filed on the Petition Date by the Borrower with the Bankruptcy Court as soon as possible and in no event later than the DIP Closing Date.

The form and substance of any motion submitted to the Bankruptcy Court requesting approval of the DIP Facility shall be satisfactory to the Backstop DIP Lenders.

The Bankruptcy Court shall have entered the Interim DIP Order, in form and substance satisfactory to the Backstop DIP Lenders, which shall not be subject to any stay or injunction or otherwise be subject to reversal on appeal as to any funded portion of the DIP Facility.

The Borrower shall have filed a chapter 11 plan and related disclosure statement on the date of the filing of the Borrower's chapter 11 petitions, which plan shall be consistent with the Restructuring Term Sheet and Restructuring Support Agreement in all respects (the "Plan") and shall be, in form and substance, satisfactory to the Backstop DIP Lenders.

For the sake of clarity, (a) no assignments to the DIP Agent or the DIP Lenders of the Priority Liens, and no consent by existing holders of Priority Lien Obligations (whether by Act of Instructing Debtholders (as defined in the Collateral Trust and Intercreditor Agreement) or otherwise), will be required as a condition to advances under the DIP Facility, and (b) the DIP Obligations will not, and will not be required to, constitute Priority Lien Obligations under the Collateral Trust and Intercreditor Agreement.

With respect to DIP Loans to be made during the Interim Period (in addition to satisfaction of the above conditions):

All representations and warranties in the DIP Documentation are accurate in all respects after giving effect to each advance (unless such representations and warranties were made as of an earlier date in which case such representations and warranties shall be accurate in all respects

as of such earlier date) and no default or event of default is in existence at the time of, or after giving effect to the making of, such advance.

The amount of any advance is consistent with the Approved Budget.[10]

| | |
|---|---|
| Additional Advance Conditions After Interim Period | (a) The Closing Conditions have been satisfied. |

(b) The Bankruptcy Court shall have entered the Final DIP Order, in form and substance satisfactory to the Backstop DIP Lenders, which Final DIP Order shall be in full force and effect and which shall not have been reversed, vacated, or stayed and shall not have been amended, supplemented, or otherwise modified in a manner adverse to the Backstop DIP Lenders without the prior written consent of the Backstop DIP Lenders.

(c) All representations and warranties in the DIP Documentation are accurate in all material respects after giving effect to each additional advance (unless such representations and warranties were made as of an earlier date in which case such representations and warranties shall be accurate in all respects as of such earlier date) and no default or event of default is in existence at the time of, or after giving effect to the making of, such additional advance.

(d) The amount of any advance is consistent with the applicable updated thirteen week cash flow forecast and related supporting schedules that have been approved by the Backstop DIP Lenders (collectively, the "Approved Budget").[11]

## VII. CERTAIN DOCUMENTATION MATTERS

| | |
|---|---|
| DIP Documentation: | All documents relating to the DIP Facility, including, without limitation, the DIP Documentation and DIP Orders, shall be in form and substance satisfactory to the Backstop DIP Lenders. |
| Funding Conditions, Representations, Warranties, Covenants, Prepayments: | DIP Documentation to contain conditions to funding, reporting requirements and provision of financial statements, representations, warranties, covenants, and prepayments customary for financings of this type and other terms as agreed to by the Loan Parties and the Backstop DIP Lenders. |

While the DIP Facility is outstanding, the Loan Parties shall submit (i) an updated thirteen-week cash flow forecast on a weekly basis that is acceptable to the Backstop DIP Lenders, and a comparison of actual performance to projections for the prior week and the prior cumulative four-week period and an explanation for any variance or other

---

[10] For the avoidance of doubt, estate-retained professionals will estimate their anticipated fees and expenses to be included within the Approved Budget; however, the fees and expenses of estate-retained professionals, or the incurrence of Term Loans for the payment thereof, shall not be subject to the Approved Budget or any variance testing thereunder.

[11] For the avoidance of doubt, estate-retained professionals will estimate their anticipated fees and expenses to be included within the Approved Budget; however, the fees and expenses of estate-retained professionals, or the incurrence of Term Loans for the payment thereof, shall not be subject to the Approved Budget or any variance testing thereunder.

|                  | information and (ii) any material changes to the 2013 budget or Approved Budget, which must be acceptable to the Backstop DIP Lenders. |
|------------------|---|
| Events of Default | Usual events of default, including, but not limited to, payment, cross-default to post-petition obligations, violation of covenants, breach of representations or warranties, judgment, ERISA, environmental, change of control, loss of material permits, licenses and regulatory approvals and other events of default which are usual and customary in facilities of this nature, modified as necessary to reflect the commencement of the Case. |
|                  | In addition, an event of default shall occur if: (i) the Case shall be dismissed or converted to a chapter 7 case; a chapter 11 trustee or an examiner with enlarged powers shall be appointed; any other superpriority administrative expense claim which is senior to or pari passu with the DIP Lenders' claims shall be granted (other than to Revolving Lenders and Agents under the Revolving Credit Facility); the Interim DIP Order or the Final DIP Order, as the case may be, shall be stayed, amended, modified, reversed or vacated; (ii) a plan shall be confirmed in the Cases which is inconsistent with the Restructuring Term Sheet or the Restructuring Support Agreement; or the Loan Parties shall take any action, including, without limitation, the filing of an application, in support of any plan that is inconsistent with the Restructuring Term Sheet or the Restructuring Support Agreement, or any person other than the Loan Parties shall do so and such application is not contested in good faith by the Loan Parties; or (iii) an official committee, if any, or any other party seeks leave to file an action challenging the validity, perfection, priority, extent or enforceability of the DIP Documentation (and the liens and claims granted thereunder). |
| Milestones | In addition, an event of default shall occur upon the failure to achieve any of the following milestones in the pre-packaged Case:[12] |
|            | • the Borrower shall have used its reasonable best efforts to send the solicitation materials to all Senior Noteholders and all holders of the Preferred Equity Interests on or before January 22, 2013, and in no event later than January 31, 2013 (the "Solicitation Date");<br>• the Company shall have filed petitions commencing the Case by |

---

[12] If the Majority Noteholders determine that the Company should pursue a pre-negotiated Chapter 11 Plan rather than a prepackaged Chapter 11 Plan, the milestones in this section shall be adjusted as follows:

• the Borrower shall have filed petitions commencing the Case by January 31, 2013;

• the Borrower shall have filed the Plan and related disclosure statement on the Petition Date;

• the Bankruptcy Court shall have entered the Interim DIP Order, which is in form and substance satisfactory to the Backstop DIP Lenders, within 10 days after the Petition Date;

• within 20 days after the entry of the Interim DIP Order, the Bankruptcy Court shall have entered the Final DIP Order, which is in form and substance satisfactory to the Backstop DIP Lenders;

• on or prior to 40 days following the Petition Date, the Loan Parties shall have obtained an order of the Bankruptcy Court approving the disclosure statement, which is in form and substance satisfactory to the Backstop DIP Lenders;

• on or prior to 75 days following the Petition Date, the Loan Parties shall have obtained an order of the Bankruptcy Court confirming the Plan, which is in form and substance satisfactory to the Backstop DIP Lenders;  and

• on or prior to 90 days following the Petition Date, the effective date of the Plan shall have occurred.

the date that is 14 days from the Solicitation Date;
- the Borrower shall have filed the Plan and related disclosure statement by the Petition Date;
- the Bankruptcy Court shall have entered the Interim DIP Order, which is in form and substance satisfactory to the Backstop DIP Lenders, within 10 days after the Petition Date;
- within 20 days after the entry of the Interim DIP Order, the Bankruptcy Court shall have entered the Final DIP Order, which is in form and substance satisfactory to the Backstop DIP Lenders;
- on or prior to 35 days following the Petition Date, the Loan Parties shall have obtained an order or orders in form and substance acceptable to the Backstop DIP Lenders by the Bankruptcy Court confirming the Plan; and
- on or prior to 50 days following the Petition Date, the effective date of the Plan shall have occurred.

| | |
|---|---|
| Remedies: | Upon occurrence and during the continuance of an Event of Default, the Backstop DIP Lenders may suspend or terminate all commitments under the DIP Facility. Following 3 days notice of such Event of Default to the Borrower, the official committee of unsecured creditors appointed in the Case, if any, and the U.S. Trustee, unless such Event of Default is cured within such time or an order of the Bankruptcy Court is entered to the contrary, the DIP Lenders shall be relieved from the automatic stay (without the need for further court order) to exercise remedies under the DIP Facility and the Borrower's right to use cash collateral shall thereupon terminate pending further order of the Bankruptcy Court. |
| Voting: | Amendments, consents and waivers under the DIP Documentation will be subject to the approval of the DIP Lenders holding at least 70.0% of the aggregate principal amount of the outstanding Term Loans (other than with respect to amendments to provisions that typically require consent of each affected DIP Lender). |
| Expenses and Indemnification: | The Borrower shall pay: (a) all actual out-of-pocket expenses of the DIP Agent and the Backstop DIP Lenders (i) associated with the preparation, negotiation, execution and delivery of this term sheet and associated with the preparation, negotiation, execution, delivery and administration of the DIP Documentation and any amendment or waiver with respect thereto (including, without limitation, the fees, disbursements and other charges of professionals and/or counsel), and (ii) incurred by the DIP Agent and the Backstop DIP Lenders in connection with the Case (including, without limitation, the fees, disbursements and other charges of professionals and/or counsel); and (b) all actual out-of-pocket expenses of the DIP Agent and the Backstop DIP Lenders (including, without limitation, the fees, disbursements and other charges of professionals and/or counsel) in connection with the enforcement of the DIP Documentation. |
| Assignments, Participations, Etc.: | The DIP Lenders shall be permitted to sell or assign their rights and obligations under the DIP Documentation, or any part thereof, to any person or entity without the consent of the Loan Parties; provided, however, that each of the Backstop DIP Lenders agrees not to make any such sale or assignment if as a result thereof the Backstop DIP Lenders or their affiliates would not hold a majority of the Term Loans and |

commitments under the DIP Facility and in any event, may not assign their "backstop" obligations described herein (except to their affiliates), including in the section entitled "Backstop DIP Lenders" above. The DIP Lenders shall be permitted to grant participations in such rights and obligations, or any part thereof, to any person or entity without consent of the Loan Parties.

Governing Law:                          State of New York, except as governed by the Bankruptcy Code.

12

### AMENDMENT ONE TO
### RESTRUCTURING SUPPORT AGREEMENT

**THIS AMENDMENT ONE TO RESTRUCTURING SUPPORT AGREEMENT** (this "Amendment") is dated as of February 4, 2013, by and among (i) Geokinetics Inc. on behalf of itself and each of its direct and indirect domestic subsidiaries and affiliates (collectively, the "Company"), which include: (a) Geokinetics Holdings USA, Inc., (b) Geokinetics Services Corp., (c) Geokinetics Processing, Inc., (d) Geokinetics Acquisition Company, (e) Geokinetics USA, Inc., (f) Geokinetics International Holdings, Inc., (g) Geokinetics Management, Inc., (h) Geokinetics International, Inc., and (i) Advanced Seismic Technology, Inc.; (ii) American Securities Opportunities Advisors, LLC ("American Securities"), Gates Capital Management, Inc. ("Gates") and the other undersigned holders (the "Noteholders"), each as the beneficial owners (or advisor, nominee or investment manager for beneficial owner(s)) of the 9.75% Senior Secured Notes due 2014 issued by Geokinetics Holdings USA, Inc. and, if and as applicable, as lenders under that certain Amended and Restated Credit Agreement dated as of August 12, 2011; and (iii) Avista Capital Partners, L.P. and Avista Capital Partners (Offshore), L.P. (the "Preferred Equity Holders" and, together with the Company and the Noteholders, each referred to as a "Party" and collectively referred to as the "Parties"), each as the beneficial owners (or advisor, nominee or investment manager for beneficial owner(s)) of preferred equity interests in Geokinetics Inc. comprised of Series B-1 Senior Convertible Preferred Stock and Series C-1 Senior Preferred Stock as well as junior preferred equity interests in Geokinetics Inc. comprised of Series D Junior Preferred Stock.

### WITNESSETH:

WHEREAS, the Company, Noteholders, and Preferred Equity Holders are party to that certain Restructuring Support Agreement, dated as of January 15, 2013 (the "Support Agreement");

WHEREAS, capitalized terms used herein without definition shall have the meanings given to such terms in the Support Agreement (as amended hereby);

WHEREAS, the Parties wish to launch the Solicitation prior to the joint execution by American Securities and Gates of an agreement authorizing and approving the form of a shareholders' agreement governing the rights of holders of New Common Stock by American Securities and Gates;

WHEREAS, American Securities and Gates are willing to modify their termination rights in connection with the Solicitation not having commenced by January 31, 2013, if the Support Agreement is modified as set forth herein, including but not limited to provide American Securities and Gates with the right to terminate the Support Agreement if such an agreement authorizing and approving the form of shareholders' agreement is not executed prior to commencement of the Chapter 11 Cases; and

WHEREAS, the Support Agreement may be amended in accordance with Section 12 thereof and the consent of the Company, Noteholders, and Preferred Equity Holders is required in connection with such amendment.

NOW, THEREFORE, for good and valuable consideration (receipt and sufficiency of which are hereby acknowledged), and intending to be legally bound hereby, the parties hereto agree as follows:

1.     Recitals. The recitals set forth above are incorporated herein by reference and are expressly acknowledged and agreed to by the parties hereto.

2.     Amendments to the Support Agreement.

(A)     <u>Section 5(a)(1)</u>.  Section 5(a)(1) of the Support Agreement, together with footnote 1 thereto, is hereby amended to replace "January 31, 2013" where it appears with "February 8, 2013".

(B)     <u>Section 5(a)(2)</u>.  Section 5(a)(2) of the Support Agreement is hereby deleted in its entirety and replaced with the following:

"the Company has not filed petitions commencing the Chapter 11 Case as soon as practicable after, and in no event before, the close of the Solicitation;"

(C)     <u>Section 6(g)</u>.  Section 6(g) of the Support Agreement is hereby amended to replace "February 15, 2013" where it appears with "March 15, 2013".

(D)     <u>Section 8</u>.  Section 8 of the Support Agreement is hereby deleted in its entirety and replaced with the following:

"<u>Termination by American Securities and/or Gates</u>.  In the event that American Securities and Gates have not jointly executed an agreement authorizing and approving the form of a shareholders' agreement governing the rights of holders of New Common Stock (as defined in the Restructuring Term Sheet) that is consistent with the Shareholders' Agreement Term Sheet (as defined in the Restructuring Term Sheet) and is otherwise reasonably acceptable to American Securities and Gates immediately prior to the commencement of the Chapter 11 Cases, then this Agreement may be terminated by either American Securities or Gates, in the discretion of each respectively, by delivering written notice of the occurrence of such event in accordance with <u>Section 14</u> below to the Parties."

2.      <u>Amendment to Restructuring Term Sheet</u>.  The fourth row of <u>Section IV. Corporate Governance and Management</u> of the Restructuring Term Sheet, entitled "Shareholders Agreement", is hereby deleted in its entirety and replaced with the following:

"It shall be a condition to the Restructuring and the Majority Noteholders' support of the Restructuring that (i) prior to the commencement of solicitation of votes to accept or reject the Plan, American Securities Opportunities Advisors, LLC ("<u>American Securities</u>") and Gates Capital Management, Inc. ("<u>Gates</u>") shall have reached mutual agreement on a term sheet for the terms of a shareholders' agreement for holders of New Common Stock (the "<u>Shareholders'</u> <u>Agreement Term Sheet</u>") and (ii) prior to the commencement of the chapter 11 cases, American Securities and Gates shall have reached mutual agreement as to the form of such shareholders' agreement for holders of New Common Stock that is consistent with the Shareholders' Agreement Term Sheet and is otherwise reasonably acceptable to American Securities and Gates."

3.      <u>Amendments to Exhibit 1 to Restructuring Term Sheet</u>.

(A) The fourth row of <u>Section VII. Certain Documentation Matters</u> of Exhibit 1 to the Restructuring Term Sheet, entitled "Milestones", together with footnote 12 thereto, is hereby amended to replace "January 31, 2013" where it appears with "February 8, 2013".

(B) The second bullet point in the fourth row of <u>Section VII. Certain Documentation Matters</u> of Exhibit 1 to the Restructuring Term Sheet, entitled "Milestones", is hereby deleted in its entirety and replaced with the following:

"the Company shall have filed petitions commencing the Case as soon as practicable after, and in no event before, the close of the Solicitation;"

4.    <u>Waiver</u>.  Each Party waives any right to terminate the Support Agreement arising from or related to the Company's failure to commence the Solicitation by January 31, 2013.

5.    <u>No Other Changes</u>.  Except as modified hereby, all of the terms and provisions of the Support Agreement shall remain in full force and effect.  This Amendment shall be construed in connection with and as a part of the Support Agreement and, except as expressly contemplated by this Amendment, all terms, conditions and covenants contained in the Support Agreement are hereby ratified and shall be and remain in full force and effect.

6.    <u>References to the Support Agreement</u>.  In furtherance of the foregoing, all references in the Support Agreement to "this Agreement" or to "the Restructuring Term Sheet" shall mean the Support Agreement or the Restructuring Term Sheet, respectfully, each as amended as of the date hereof and as may be further amended, from time to time hereafter.

7.    <u>Counterparts; Electronic Signatures</u>.  This Amendment may be executed in multiple counterparts, each of which, when executed, will be deemed an original, and all of which will constitute but one and the same instrument. A signature of a Party transmitted to the other Party by facsimile, PDF or other electronic means shall constitute the original signature of such Party for all purposes.

8.    <u>Incorporation by Reference</u>.  Sections 12 through 31 of the Support Agreement, inclusive, are incorporated herein in their entirety by reference.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Amendment One to Restructuring Support Agreement to be duly executed and delivered as of the date first above written.

Geokinetics Inc.

By: _____
Name: Gary L. Pittman
Its:

Geokinetics USA, Inc.

By: _____
Name: Gary L. Pittman
Its:

Geokinetics Holdings USA, Inc.

By: _____
Name: Gary L. Pittman
Its:

Geokinetics International Holdings, Inc.

By: _____
Name: Gary L. Pittman
Its:

Geokinetics Services Corp.

By: _____
Name: Gary L. Pittman
Its:

Geokinetics Management, Inc.

By: _____
Name: Gary L. Pittman
Its:

Geokinetics Processing, Inc.

By: _____
Name: Gary L. Pittman
Its:

Geokinetics International, Inc.

By: _____
Name: Gary L. Pittman
Its:

Geokinetics Acquisition Company

By: _____
Name: Gary L. Pittman
Its:

Advanced Seismic Technology, Inc.

By: _____
Name: Gary L. Pittman
Its:

*[Signature Page to Amendment One To Restructuring Support Agreement]*

ASOF II Investments, LLC ("ASOF II")
American Securities Opportunity Fund, L.P. ("ASOF")
American Securities Opportunities Fund (B), LP
("ASOFB")

By:      _____
Name:   Lawrence First
Title:    Managing Director

Telephone: (212) 476-4971
Facsimile:  _____

*[Signature Page to Amendment One To Restructuring Support Agreement]*

Gates Capital Management, Inc.


By:    _____
Name:  Jeffrey L. Gates
Title:    President

Telephone:  (212) 626-1421
Facsimile:  (212) 626-1417

*[Signature Page to Amendment One To Restructuring Support Agreement]*

Avista Capital Partners (Offshore), L.P.


By:     _____
Name:  Jeff Gunst
Title:    Authorized Signatory

Telephone: (212) 593-6900
Facsimile:  (212) 593-6901

*[Signature Page to Amendment One To Restructuring Support Agreement]*

Avista Capital Partners, L.P.


By:        _____
Name:   Jeff Gunst
Title:     Authorized Signatory

Telephone: (212) 593-6900
Facsimile:  (212) 593-6901

*[Signature Page to Amendment One To Restructuring Support Agreement]*

## EXHIBIT G

### TERM SHEET FOR NEW SHAREHOLDERS AGREEMENT

# GEOKINETICS, INC.

## SUMMARY OF TERMS OF STOCKHOLDERS' AGREEMENT

**This Term Sheet summarizes the principal terms of the equity capitalization and related documentation of Geokinetics, Inc., a Delaware corporation (the "Company").**

| | |
|---|---|
| *Type of Securities* | The Company's equity capital structure will consist entirely of common stock. The holders of the Company's common stock are referred to herein individually as a "**Holder**" and collectively as the "**Holders**". |
| *Initial Board Composition* | The Board of Directors (the "**Board**") of the Company will initially consist of 5 members. The members of the Board will be determined prior to the confirmation hearing. The initial Board shall be designated as follows: (i) two directors designated by American Securities Opportunities Fund (which holds at least 40% of the outstanding Notes), (ii) one director designated by Gates Capital Management (which holds at least 20% of the outstanding Notes), (iii) the Chief Executive Officer of the Company and (iv) one director who will be an independent director with relevant industry experience selected by the holders of at least 60% of the Notes. |
| *Corporate Governance* | After consummation of the plan of reorganization of the Company, the Board will be designated as follows: |

- For each stockholder that owns 40% (subject to adjustment based on the terms of the section of this term sheet entitled "*Participation Rights*") or more of the Company common stock upon the effectiveness of the Stockholders Agreement (which shall be the consummation of the plan of reorganization of the Company) (the "**Effective Date**"), such stockholder shall have the right to designate two directors; provided that at such time as such stockholder owns less than 40% and 20% or more of the Company common stock, such stockholder shall have the right to designate one (1) director.

- For each stockholder that owns 20% (subject to adjustment based on the terms of the section of this term sheet entitled "*Participation Rights* ") or more of the Company common stock (but less than 40%) as of the Effective Date, such stockholder shall have the right to designate one director,

- 1 member will be the Chief Executive Officer of the Company.

- 1 member will be an independent director with relevant industry experience chosen by at least Holders owning at least 60% of the outstanding common stock, excluding any common stock issued pursuant to a management incentive equity plan.

The composition of the board of directors of any subsidiaries of the Company will be identical to the Board. Each of the Holders shall agree to vote all of their shares of Company common stock for the designees as set forth above. With respect to each of the designees set forth in the first three bullets, each Holder shall agree to vote all of its shares for the designees set forth above. With respect to the director set forth in the last bullet, such director will be elected as set forth therein.

A "**Designated Investor**" shall mean a stockholder that has the right to initially designate a member of the Board as set forth herein, including such stockholder's immediate and successive successors, transferees and assigns, for any period of time that such stockholder or such stockholder's successors, transferees or assignees, as applicable, satisfies the Minimum Ownership Condition (as defined in the following sentence). For purposes of clarity, the rights of the Designated Investors under this section entitled "*Corporate Governance*" shall terminate when such Designated Investor holdings of the Company's common stock are less than 20% of the issued and outstanding Company common stock (such condition, the "**Minimum Ownership Condition**"), as such stockholder will no longer satisfy the Minimum Ownership Condition and will therefore no longer be a Designated Investor.

The Board will have the authority to establish committees of the Board.

At all meetings of the Board, members entitled to cast a majority of the votes of the entire Board shall constitute a quorum for the transaction of business and the act of members entitled to cast a majority of the votes present at any meeting at which there is a quorum shall be the act of the Board. Notwithstanding the foregoing, for so long as any Designated Investors maintain the ability to designate a member of the Board as set forth in this this section entitled "*Corporate Governance*", then a quorum shall not be present for the transaction of business of the Board unless at least one representative of each such Designated Investor, as

applicable, is present at such meeting.

| | |
|---|---|
| ***Protective Provisions*** | The Company shall not take any of the actions set forth on <u>Schedule A</u> without the prior written consent of at least 60% of the outstanding Company common stock held by all Holders (excluding any stock issued pursuant to a management incentive equity plan) ("**<u>Supermajority Consent</u>**"). |

***Participation Rights***

Holders who are accredited investors and hold greater than 5% of the issued and outstanding common stock of the Company (each a "**<u>Significant Holder</u>**" and collectively the "**<u>Significant Holders</u>**") shall be entitled to purchase their pro rata portion, based on their equity interest in the Company, of any future issuances of equity securities of the Company or any of its wholly owned subsidiaries, other than with respect to the issuance of Company equity securities (i) pursuant to a management compensation plan approved by the Board, (ii) in connection with a bona-fide acquisition, or merger, (iii) in connection with a public offering, (iv) in connection with debt financing to the lenders in such debt financing (provided that the source of such debt financing is not an Designated Investor), (v) in connection with creation or operation of any bona fide joint venture or strategic alliance or (vi) issuances to the Company or any wholly owned subsidiary of the Company. Notwithstanding the foregoing, no issuances may be made pursuant to clauses (i), (ii), (iv), (v) and (vi) if the effect would be to cause (A) any Designated Investor to not meet the Minimum Ownership Condition without the consent of such Designated Investor, or (B) the Designated Investor entitled to designate two directors to not meet the 40% threshold in order to appoint a second director without the consent or such Designated Investor; provided, however, that in any case, nothing herein shall prohibit a transaction set forth in clause (ii) so long as the Minimum Threshold Condition and each of the percentages set forth in "*Corporate Governance*" are adjusted downward to account for the such dilution so as not to effect the Designated Investors' rights thereunder, but in no case less than 12.5% (in the case of any Designated Investor entitled to appoint one director) and 25% (in the case of any Designated Investor entitled to appoint two directors). Each Significant Holder shall also have a right of over-allotment to the extent that another party elects not to purchase its full pro-rata portion.

***Management Incentive Plan***

The Company will be authorized to issue up to 10% of the common stock of the Company measured as of the Effective Date.

**Information Rights**

Each Holder owning at least 1% of the outstanding Company common stock (other than competitors, customers and suppliers of the Company, as determined in good faith by the Board) shall have the right to quarterly and annual financial statements from the Company. Each Significant Holder shall have standard inspection rights and the right to receive any other information that any other stockholders are entitled to. Additionally, each Significant Holder shall have reasonable access to the Company's management during normal business hours, provided that such access does not materially interfere with the operation of the Company's business. Notwithstanding the foregoing, all Holders (other than competitors, customers and suppliers of the Company, as determined in good faith by the Board) shall be entitled to receive copies of the Company's annual audited financial statements. Each person with information rights shall agree to keep such information confidential.

**Rights of First Refusal; Restrictions on Transfer**

The Board must approve the proposed transfer of any Company equity securities by any Holder solely to the extent necessary, as determined by the Board in its reasonable discretion, to prevent (i) any violations of securities laws, (ii) the Company from becoming a reporting company under applicable securities laws, (iii) the limitation or elimination of the Company's net operating losses, or (iv) the transfer of Company equity securities to competitors, customers or suppliers of the Company.

Each Designated Investor shall have a right of first refusal to purchase any transfer of the Company's equity securities held by the other Designated Investors.

Thereafter, each Significant Holder (including the Designated Investors) shall have a right of first refusal to purchase their pro rata share of any such approved transfer of Company's equity securities by any Holder. Each Significant Holder having such right of first refusal shall also have a right of over-allotment to the extent that the other Significant Holders elect not to purchase their respective full pro rata portion of Company equity securities transferred by any Holder.

**Tag-Along Rights**

For any period of time that any Holder owns satisfies the Minimum Ownership Condition (a "**selling Holder**"), each other Holder that satisfies the Minimum Ownership Condition at such time shall have customary tag-along rights

with respect to any transfers of Company equity securities by the selling Holder.

**Drag-Along Rights**

Subject to the approval rights set forth in the Stockholders agreement, the Holders shall agree to customary drag-along rights on a sale of the Company (either through a merger, sale of stock, or sale of assets) approved or made by the Board and Holders holding a majority of the Company's common stock.

**Registration Rights**

Each Designated Investor shall have at least 1 long-form demand registration, 1 short-form demand registration and unlimited piggyback registration rights. No demand registration rights may be exercised by any Designated Investor for three years following the Effective Date.

Each Significant Holder shall have the right to 3 piggyback registrations.

**Amendment/Termination**

The Stockholders' Agreement shall terminate upon an initial public offering of the Company's common stock. The Stockholders' Agreement cannot be amended without the consent of Holders owning a majority of the Company's common stock; provided that:

(i) the terms set forth in (A) "*Corporate Governance*" (or any change in the size of the Board), (B) "*Participation Rights*", (C) "*Management Incentive Plan*", (D) "*Rights of First Refusal; Restrictions on Transfer*", (E) "*Tag-Along Rights*", (F) "*Registration Rights*", and (G) "*Amendment/Termination*" with respect to the items set forth in this clause (i) may not be amended without the consent of each Designated Investor;

(ii) the terms set forth in (A) the last sentence of "*Information Rights*", (B) "*Drag Along Rights*", (C) "*Protective Provisions*" and (D) "*Amendment/Termination*" with respect to the items set forth in this clause (ii) may not be amended without Supermajority Consent; and

(iii) if such amendment would adversely and disproportionately affect the rights of any Holder vis-a-vis any similarly situated Holder, then such amendment shall require the consent of such affected Holder.

## Schedule A
## Protective Provisions

- A sale of the Company or its material subsidiaries whether through sale of stock, sale of substantially all of the assets of the Company or its subsidiaries (on a consolidated basis), merger, consolidation or otherwise, but excluding any acquisition of assets (including equity securities) by the Company or any of its subsidiaries of another person in which the stockholders of the Company become the majority holders of the surviving entity;

- Liquidate, dissolve or wind-up the business and affairs of the Company and its subsidiaries (on a consolidated basis);

- Amend, alter or repeal any provision of the Certificate of Incorporation of the Company;

- The entering into of any Affiliate Transactions by the Company or its subsidiaries;

- Increase the aggregate amount of equity of the Company (including derivatives thereof) authorized to be issued pursuant to a management compensation plan;

- The issuance by the Company or any of its wholly owned subsidiaries of equity securities in connection with a transaction described in clause (ii) of the "*Participation Rights*" section of this term sheet in the case where Significant Holders are not given an opportunity to purchase their pro rata portion (based on their equity interest in the Company) and such issuance results in (A) in the case of any Designated Investor entitled to appoint one director, such Designated Investor's ownership of Company common stock to fall below 12.5%, or (B) in the case of any Designated Investor entitled to appoint two directors, such Designated Investor's ownership of Company common stock to fall below 25%; or

- Agree or consent to any of the foregoing.

For purposes of this Agreement:

"**Affiliate Transaction**" means any payment to, or sale, lease, transfer or other disposition of any of the properties or assets of the Company or its subsidiaries to, or the purchase of any property or assets from, or the entering into, making, amending, renewing or extending of any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company (other than the Company and its subsidiaries); provided, however, that "**Affiliate Transactions**" shall not include (i) employment arrangements, and (ii) payment of any fees incurred in connection with service as a member of the Board or any board of directors or similar governing body of any subsidiary of the Company.

"**Affiliate**" shall mean any shall mean any stockholder of the Company that meets the Minimum Ownership Condition.